ROBERT R. TREMPE, JR., & another *vs.* AETNA CASUALTY
AND SURETY COMPANY.

Hampden.   February 7, 1985. — July 24, 1985.

Present: ARMSTRONG, PERRETTA, & SMITH, JJ.

*Insurance,* Unfair act or practice, Disclaimer of liability, Fire, Interest.
*Consumer Protection Act,* Insurer, Availability of remedy, Unfair act or
practice, Attorney's fees.

In an action on a policy of fire insurance, following a fire which damaged the
plaintiffs' house and its contents, the judge's findings of fact and her
conclusions favorable to the plaintiffs were not clearly erroneous.
[451-452]

In an action under G. L. c. 93A, the Consumer Protection Act, by home-
owners against their insurer, there was no error in the judge's conclusions
that, although the insurer had a reasonable basis for resisting liability
in view of the incendiary nature of the fire that gave rise to the plaintiffs'
claim, the insurer had failed to be responsive and cooperative in dealing
with the claim; that the insurer's conduct had not been grounded in good
faith; and that, in its handling of the claim, it had violated G. L. c. 176D,
§ 3 (9) (*b*), (*e*), and (*n*). [452-457]

Under G. L. c. 93A, § 9, as in effect at the time of certain unfair or decep-
tive acts by a defendant insurance company, plaintiffs were not entitled
to recover damages against the company in the absence of pleading and
proof of loss resulting from the company's unfair or deceptive acts.
[457]

Plaintiffs who prevailed on a claim of unfair acts or practices by an insurance
company were entitled to recover their attorney's fees under G. L.
c. 93A, § 9 (4), even though they were not entitled to damages under
G. L. c. 93A, § 9 (1), as in effect at the time of the defendant's unfair
acts or practices. [457-458]

Interest under G. L. c. 175, § 99, Twelfth, against an insurer for delay in
payment of a claim was correctly computed from the date the insurer
received an executed proof of loss, rather than from the later date on
which the insurer and the insureds agreed on the amount of damages.
[458-459]

CIVIL ACTION commenced in the Superior Court Department
on March 7, 1979.

The case was heard by *Elizabeth J. Dolan, J.*

*Paul S. Weinberg* for the insurer.

*Burton Winnick (Mark D. Modest* with him) for the plaintiffs.

PERRETTA, J. When Robert and Eileen Trempe's house and its contents were damaged by fire on July 29, 1977, they presented a claim for their loss to their insurer, the defendant Aetna. Aetna declined to pay on the policy on the basis that the Trempes intentionally and knowingly caused or contributed to the cause of the fire. Judgment in favor of the Trempes entered on their complaint brought under G. L. c. 93A, §§ 2 & 9, and G. L. c. 176D, §§ 2 & 3. On Aetna's appeal, we affirm the judgment as to liability but remand the matter for recalculation of the Trempes' damages consistent with this opinion.

I. THE FACTS.

As the judge's findings, both subsidiary and ultimate, are not clearly erroneous, see *Page* v. *Frazier,* 388 Mass. 55, 61-62 (1983), we relate the facts as she found them. On Friday, July 29, 1977, the Trempes arrived from work at their Agawam home and began preparations for a weekend camping trip with friends in Hampton, New Hampshire. The trip had been planned for a number of weeks. While packing, Robert received a telephone call from a Dan O'Brien, an acquaintance known to the Trempe family from their frequent weekends at a campsite in Webster, where they owned a vacation trailer. O'Brien wanted to borrow the Trempes' family car because his was being repaired. In addition to the family car, Robert had a company car for his business and personal use. The family car was a 1973, dark red, Oldsmobile station wagon, equipped with a roof rack and trailer hitch, and bearing registration number "Y82818." Robert agreed and arranged with O'Brien that he (Robert) would leave the keys to the car under the front seat floor mat in the event the family should leave for the weekend before O'Brien could pick up the car.

At about 6:00 P.M., before O'Brien arrived, the Trempes, their two children and the daughter of their Hampton hosts set out for Hampton, only to return to the house within moments to pick up sunglasses that Robert had left behind. The Trempes'

son, William, went into the house to get the glasses. He used the door closest to the driveway. This side entrance door had had a malfunctioning lock for a number of years, but it was the house entrance typically used by the family.

During the Trempes' brief return to their house, O'Brien arrived to take their family car. He was dropped off by a man driving a red truck who was known only as Jack. O'Brien spoke briefly with the Trempes, took the keys to the car, and left at the same time as the Trempes.

Approximately forty-five minutes later, the Trempes' next-door neighbors heard what sounded like exploding fireworks coming from the Trempes' house. They ran out towards the noise in time to see an unidentified male run from the Trempes' house, get into a dark red station wagon, and race out of the driveway. They noted a "Y" and an "8" on the license plate of the car. Fire broke out in the house, and the fire department was called.

The Trempes were called in Hampton that night by the police, who advised them of the fire and the extent of the damage (the house was uninhabitable) and asked that they come to the police station in the morning. Leaving Hampton immediately, the Trempes drove to their trailer in Webster. Upon their arrival at the campgrounds, they saw their station wagon. Robert spoke with O'Brien at the campsite.

Saturday morning the Trempes left Webster to go to the police station. O'Brien agreed to meet them there, but he failed to appear. He did go to the police station the following Monday and agreed to participate in a lineup scheduled for a later date. Although the Trempes' neighbors had seen a red pickup truck in the area and the station wagon in the driveway prior to the fire, the neighbors did not identify O'Brien in the lineup as the man seen running from the Trempes' house.

Subsequent investigation of the fire by fire officials indicated that the fire was incendiary in nature with eight different points of origin. Gasoline had been used as an accelerant.

When the Trempes purchased their house in 1971 for $21,500, their mortgage was in the amount of $19,500. The monthly mortgage payments, which included principal, interest,

and taxes, were about $200. On July 29, 1977, the insurance policy in question provided the following coverages: $34,200, for the dwelling; $17,100, for personal property; and $6,840 for additional living expenses. The house was the principal residence of the Trempes and their three children, two of whom (teenagers) were still living at home in July of 1977. Both Robert and Eileen worked, and their anticipated combined gross income for 1977 was in the range from $22,000 to $25,000.

II. AETNA'S LIABILITY ON THE POLICY.

Aetna's true quarrel with the judge's findings is that she, as the fact finder, declined to draw inferences favorable to Aetna rather than the Trempes. But the judge carefully marshalled the facts favorable to each side, balanced them, and concluded that, as the fact finder, she had not been persuaded by a preponderance of the evidence that the Trempes had caused or contributed to the cause of the fire.

Those facts found favorable to Aetna are: (a) the incendiary nature of the fire; (b) the unexplained presence of "the family station wagon on the property" after the Trempes "had departed the area"; (c) the presence of the unidentified male seen just before the fire leaving the house in the Trempes' "vehicle or one strangely similar to it"; and (d) the borrowing of the family car by an acquaintance before the family left for a weekend trip. On the other hand, the Trempes' mortgage payments (even considering the fact of a second mortgage as a result of a loan from a finance company) "did not constitute an extreme or pressing amount for housing cost." Although both mortgages were one month in arrears on the date of the fire, "that indebtedness was not consequential considering the combined cash flow of the joint salaries." Further, the Trempes' consumer indebtedness "was not substantial," even though Eileen had been involved in an automobile accident in the fall of 1976, and had been absent from work "on a sporadic basis" for some weeks thereafter. Her medical bills "were apparently covered adequately" by insurance. Inferably, the house had increased in fair market value "with the general rise in real estate values," some capital improvements had been made, and there was no

evidence to show that the house had "deteriorated" or suffered from "neglect." Although the Trempes had increased their homeowner's insurance over the years, that had been done at the "behest of" their insurance agent "to reflect increased costs in construction." The house had never been placed upon the real estate market or offered for sale.

Finally, when the Trempes left for Hampton, they took only those clothes "suitable for their camping weekend." There was no evidence to show that they had removed "personal property or cherished family possessions . . . to a position of safety" prior to the fire, nor was there any evidence indicating marital discord or problems involving the children.

It is not our function to speculate whether another fact finder would have reached a different conclusion. In reviewing subsidiary and ultimate findings, we look only for clear error. See *Page* v. *Frazier,* 388 Mass. at 61-62; *Markell* v. *Sidney B. Pfeifer Foundation, Inc.,* 9 Mass. App. Ct. 412, 429-430 (1980). We see no error in the judge's conclusion that the Trempes were due $20,947 under their policy.[1]

III. THE c. 93A CLAIM.

In describing the manner (as found by the judge) in which Aetna processed the Trempes' claim, we (like the judge) are mindful that Aetna had a reasonable basis for resisting liability even though the ultimate holding was adverse to its position on that issue.

Aetna's adjusters and representatives began their investigation of the fire by the first week of August, 1977. The Trempes signed the necessary releases so that their financial affairs could be ascertained. Friends and neighbors were questioned about the fire, as were the Trempes' children. The Trempes requested that when their fifteen-year-old son was interviewed, an adult be present with him. The investigator did not comply with the Trempes' request, which the judge found to be a reason-

---

[1] The amount of the loss suffered by the Trempes from the fire was $38,000: $32,000 for their property, real and personal, and $6,000 for their living expenses. Aetna, on May 31, 1979, had paid the Trempes' mortgage, $17,053. See G. L. c. 175, § 97.

able one, and the boy and his parents were extremely upset by the investigator's action. Except for that interview, the judge found Aetna's investigation to be reasonable.

On August 31, 1977, the Trempes filed a "Sworn Statement in Proof of Loss," declaring their total amount of damages to be $39,000. Their attorney, on September 20, wrote to Aetna and protested the ongoing "investigatory activities" but offered continued cooperation and any other documentation necessary to process the claim. Counsel for the Trempes also asked Aetna to specify any terms or conditions that had not been met in order that they could be satisfied. Eight days later, on September 28, Aetna acknowledged receipt of the Trempes' sworn statement of August 31 and counsel's letter. In this writing of September 28, Aetna also advised that the Trempes' statement had been rejected because the cause and origin of their loss had not been fully and correctly stated, the amount of their claim was excessive, and for "other good and sufficient reasons."

Left uncertain by this letter whether Aetna was denying liability on the policy, the Trempes, by letter of November 1, 1977, questioned the basis for the rejection of their statement and requested clear indication whether their claim had been denied. That letter was never answered.

A demand for reference on the issue of the amount of the loss was made by the Trempes on December 6. See G. L. c. 175, § 100. Although under that statute, Aetna should have responded within ten days, it did not do so until February 15, 1978. Resort to the reference procedures was ultimately unnecessary because on November 30, 1978, an agreed statement was filed indicating that the damages suffered by the Trempes amounted to $38,000.[2]

---

[2] After the parties reached agreement as to the amount of the Trempes' loss, Aetna wrote to the Trempes, stating that notwithstanding the agreement as to the amount of the loss, "it is expected that Aetna will deny liability." The judge concluded that, prior to the commencement of this suit, Aetna had never unequivocally denied liability. She viewed Aetna's letter of September 28 as indication that the Trempes' claim had been rejected only because of "certain deficiencies within the statement and claim which were

In the meantime, on November 28, 1977, the Trempes' mortgagee had made a demand under G. L. c. 175, § 97, for payment on the mortgage in the amount of $17,053. The mortgagee and Aetna had engaged in substantial correspondence on the matter, and the mortgagee had complained to the Commissioner of Insurance. During this period, the Trempes received notices of foreclosure.

On these facts, the judge found: (1) that Aetna's delay in responding to the Trempes' demand for reference procedures was unreasonable in light of the ten-day period imposed by G. L. c. 175, § 100; (2) that although some delay in responding to the mortgagee's demand made under G. L. c. 175, § 97, was reasonable, Aetna's delay in payment until May 31, 1979, was unreasonable in view of the fact that the amount of damage had been agreed upon on November 30, 1978; and (3) that Aetna had violated G. L. c. 176D, § 3 (9) (b), (e), and (n).[3]

From our review of Aetna's various claims of error in the judge's findings, we discern two basic contentions: (1) that in view of the circumstances of the fire and the ongoing nature of the negotiations between Aetna and the Trempes and Aetna and the mortgagee, the untimeliness of the responses under G. L. c. 175, §§ 97 & 100, was not unreasonable; and (2) that the facts found by the judge do not show that Aetna had engaged in a pattern of unfair claim settlement practices.

---

susceptible of correction once further clarification was provided." Aetna contends that when its letters of September, 1977, and November, 1978, are read together, it is clear that Aetna had denied liability. We see no error in the judge's reading of the correspondence.

[3] Those subsections, inserted by St. 1972, c. 543, § 1, provide that the following acts constitute unfair claim settlement practices:

"(b)  Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

"  . . . .

"(e)  Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

"  . . . .

"(n)  Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

As to Aetna's first contention, we do not make the suggestion that an insurer must forgo a thorough investigation of a claim that it has a reasonable basis for regarding as suspicious or run the risk of a c. 93A complaint. All that is required is that the insurer deal with its insured with candor and fairness. As stated by the judge in her conclusions of law: "Had the status of liability been clearly established as to the position of . . . [Aetna] at the outset of these proceedings in the fall of 1977, the case might well have fallen into that category of a controversy rooted in genuine differences of opinion wherein there would have been no bad faith on the insurer's part. The failure of . . . [Aetna] to be responsive and cooperative in dealing with this claim leaves no other conclusion than that it was acting in bad faith."

Aetna's argument that its failure to respond in timely fashion to the demand for reference procedures was due to the ongoing nature of negotiations strikes us as disingenuous in view of the chronology of events. The purpose of G. L. c. 175, § 100, is to *expedite* the settlement of claims. See *Employers' Liab. Assur. Corp.* v. *Traynor,* 354 Mass. 763 (1968). Yet, on September 28, 1977, Aetna rejected the Trempes' sworn statement of loss of August 31, 1977, and never gave a clear reason for the rejection, notwithstanding the letter from counsel for the Trempes; and an agreement as to the amount of the loss was not reached until almost a year after the Trempes' request for reference and not until after three referees had been impaneled.

Aetna contends that it did not delay in making payment to the mortgagee under G. L. c. 175, § 97. It points out that it sent the mortgagee a check in the amount of $17,053 on December 8, 1978, just one month after the amount of damages had been agreed upon by the parties. The mortgagee, however, refused the check, claiming it was owed $19,000, due to interest which had accrued on the mortgage note after the date of the fire. We need not take up the issue whether the mortgagee was in fact entitled to interest. See *Ben-Morris Co.* v. *Hanover Ins. Co.,* 3 Mass. App. Ct. 779, 779-780 (1975). The question is whether Aetna acted with candor and fairness, and expeditiously, in handling the claim.

The mortgagee made its demand on Aetna under G. L. c. 175, § 97, on November 28, 1977, and on February 15, 1978, the mortgagee filed a complaint with the Commissioner of Insurance. Aetna's response of the same date was that the amount of the loss had not been settled and, therefore, payment was not due. Yet, on September 28, 1977, Aetna's attorney advised it that even were arson by the Trempes established, Aetna would be obligated to pay the first *and* second mortgagees, and that a "proper fair amount of the claim might be in the area of $32,000. The first and second mortgages total about $22,000." Thus, even were we to agree with Aetna that, contrary to the judge's finding, payment was tendered by Aetna in December of 1978, rather than May, 1979, we would nonetheless conclude that Aetna's failure to act more promptly was not grounded on good faith.

Aetna's final contention is that assuming (without conceding) that it had violated G. L. c. 176D, § 3(9) (*b*), (*e*), and (*n*), in respect to the Trempes' claim, there was no showing that Aetna's "conduct . . . was part and parcel of a larger, overall pattern of unfair claims settlement practices which . . . [Aetna] customarily engaged in." Aetna relies on *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 675-676 (1983), wherein the court noted, without finding it necessary to decide, that certain clauses of c. 176D, § 3(9), specifically (*d*) and (*f*), contain language indicating that "multiple refusals or failures, not . . . a single act" must be shown. *Id.* at 676. Clauses (*b*) and (*e*), here at issue, see note 3, *supra,* contain comparable language.[4]

We need not take up the question left open in *Van Dyke* and *Swanson,* that is, whether a single act can constitute a violation of various clauses of subsection 9 of § 3, because "[c]lause (*n*)

---

[4] As noted in *Swanson* v. *Bankers Life Co.,* 389 Mass. 345, 349 n.5 (1983); G. L. c. 93A, § 9, as amended by St. 1979, c. 406, § 1, now makes specific reference to G. L. c. 176D, § 3(9). We note that the amendment was effective October 18, 1979, and that it is "to receive only prospective application." *Smith* v. *Caggiano,* 12 Mass. App. Ct. 41, 43 (1981). The Trempes filed their complaint on March 7, 1979, alleging a violation of G. L. c. 93A, § 2, as well as of G. L. c. 176D. See *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.,* 388 Mass. at 676 n.5.

. . . refers to a single instance of failing to give a reasonable explanation of the basis in the insurance policy for denying a claim." *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.,* 388 Mass. at 676 n.4.

IV. THE JUDGMENT.

A. *Damages Under G. L. c. 93A, § 9.*

The judge concluded that the Trempes were entitled to recover $20,947 under the policy. See note 1, *supra.* Because Aetna's violation of G. L. c. 93A, § 9, was found to be "wilful and knowing,"[5] the judge doubled the award. However, under § 9(1), as amended by St. 1971, c. 241, i.e., as in effect on the date "when the incidents underlying the complaint occurred," *Smith* v. *Caggiano,* 12 Mass. App. Ct. 41, 43 (1981), the Trempes were required to plead and show a loss of money or property as a result of the unfair and deceptive act. The damages here awarded are based on the fire and not on the unfair acts. See *DiMarzo* v. *American Mut. Ins. Co.,* 389 Mass. 85, 101-102 (1983). Cf. *Shapiro* v. *Public Serv. Mut. Ins. Co.,* 19 Mass. App. Ct. 648, 657 (1985). As the Trempes failed to show the amount of the actual damages caused by the unfair acts which the judge found to be wilful and knowing, their recovery under c. 93A, § 9, cannot stand.[6] See *ibid.*

B. *Counsel Fees Under G. L. c. 93A, § 9(4).*

In *Shapiro* v. *Public Serv. Mut. Ins. Co.,* 19 Mass. App. Ct. at 657-658, we concluded that counsel fees could be awarded under G. L. c. 93A, § 11, even in the absence of proof of actual damages, upon a showing that an unfair act or practice had been committed. Section 9(4), inserted by St. 1969, c. 690, provides in pertinent part, and language identical to that of § 11, that "[i]f the court finds in any action commenced

---

[5] Aetna also failed to respond in a timely fashion to the Trempes' demand letter under G. L. c. 93A, § 9(3).

[6] We do not read that part of § 9(3) which provides that a prevailing plaintiff shall recover "the amount of actual damages *or* twenty-five dollars, whichever is greater," (emphasis supplied) as contradictory of the pre-1979 requirement in § 9(1) that the plaintiff must show a loss of money or property. Rather, we construe § 9(3) as providing a plaintiff who establishes a loss, no matter how small, with a guaranteed recovery of at least $25.

hereunder that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorney's fees and costs incurred in connection with said action." The evolution of c. 93A has shown that there is a benefit to the public where deception in the marketplace is brought to light (and thereby corrected) by an individual who has been deceived even though his actual damages were not proved. Contrast *Levy* v. *Bendetson,* 6 Mass. App. Ct. 558, 560 (1978), where the plaintiff in counterclaim under c. 93A, § 11, failed to show that damages had been suffered.

Section 9(4) and § 11 are based upon the same policy considerations and employ identical language with respect to awards of counsel fees and costs. We, therefore, reach a consistent conclusion and the award of counsel fees is to stand. See *Shapiro* v. *Public Serv. Mut. Ins. Co.,* 19 Mass. App. Ct. at 657-658. In addition, the Trempes may recover attorneys' fees for the appellate proceedings in an amount to be determined by a judge of the Superior Court. See *Patry* v. *Liberty Mobilehome Sales, Inc.,* 394 Mass. 270, 272 (1985).

C. *Interest Under G. L. c. 175, § 99.*

The eighteenth paragraph of G. L. c. 175, § 99, Twelfth, as amended through St. 1973, c. 349, § 1, reads in pertinent part: "The . . . [insurer] shall be liable for the payment of interest to the insured at a rate of one per cent over the prime interest rate *on the agreed figure* commencing thirty days *after the date an executed proof of loss* for such figure is received by the [insurance] company, said interest to continue so long as the claim remains unpaid" (emphasis supplied). The judge concluded that the "agreed figure" was the "actual damages" sustained by the Trempes ($20,947) and computed the interest commencing September 30, 1977, the thirtieth day after the Trempes had filed their sworn proof of loss claiming damages in the amount of $39,000.

Aetna's sole contention on the issue of interest is that because it rejected the Trempes' statement (as being "excessive"), there was no "agreed figure" until November 30, 1978, the date

Aetna and the Trempes filed an agreed statement of damages in the amount of $38,000. Hence, Aetna continues, interest should be computed on the actual damages beginning on December 30, 1978.

The judge's award of interest is based upon the clear language of the statute. The key date for the period of interest computation is the date upon which the insurance company receives an executed proof of loss. The "agreed figure" and "an executed proof of loss" are specific and different phrases. This is readily apparent from the seventeenth par. of cl. Twelfth of § 99, as appearing in St. 1981, c. 718, § 2, which mandates the procedures by which the "insured shall forthwith render to . . . [the insurance company] a signed, sworn statement in proof of loss . . . ." A reading of the two paragraphs shows that the Legislature has carefully selected its language to provide a system for expediting claims for the benefit of all parties involved. Cf. *First Natl. Bank* v. *Judge Baker Guidance Center,* 13 Mass. App. Ct. 144, 153 (1982), and cases therein cited. Aetna's contention is contrary to the express language and purpose of the statute. See *Employers' Liab. Assur. Corp.* v. *Traynor,* 354 Mass. at 763.

V. CONCLUSION.

The judgment is reversed, and a new judgment is to be entered consistent with part IV of this opinion.

*So ordered.*