Sosman, J.
Plaintiff Commercial Union Insurance Company (“CU”) brought the present action seeking a declaration that it is not obligated to pay underinsured motorist benefits to the defendants, John and Judith Marsh, under a motor vehicle policy that CU issued to Marsh’s employer (defendant Lawrence Watson d/b/a Foreign Auto Engineering). The Marshes filed a counterclaim seeking a declaration that they are entitled to such coverage under the CU policy, along with claims under G.L.c. 176D, §3(9) and G.L.c. 93A, §9 for unfáir claim settlement practices. The parties have filed cross motions for summary judgment on all of their respective claims.
For the following reasons, the court grants defendants’ motion with respect to the claim for declaratory relief and grants defendants’ motion on the c. 176D and c. 93A claims with respect to liability and single damages only. The record of undisputed facts does not, at this juncture, permit summary judgment on the issue of multiple damages and attorneys fees which defendants are claiming under G.L.c. 93A.
UNDISPUTED FACTS
CU issued a motor vehicle policy to defendant Lawrence Watson which included underinsured motorist coverage in the amount of $250,000 per person/$500,000 per accident to any occupant of the vehicle unless the occupant was covered by a policy of his own or of any household member providing similar coverage. On June 14, 1990, defendant John Marsh was injured while driving the Watson vehicle insured by CU. The other vehicle involved in the accident was owned and driven by Christine Mitchell (“Mitchell”). Mitchell’s vehicle carried liability insurance of $25,000 per person/$50,000 per accident.
At the time of the accident, John Marsh’s wife, defendant Judith Marsh, had a policy from Arbella Mutual Insurance Company (“Arbella”) insuring her 1981 *71 Volvo. The coverage selections page on the Arbella policy lists $10,000 per person/$20,000 per accident underinsurance with a corresponding premium of “0.00.”
In May 1991, the Marshes filed a civil action against Mitchell. Mitchell’s insurer promptly offered the Marshes the $25,000 policy limit in full settlement of the claim. On May 17, 1991, the Marshes’ attorney wrote to CU notifying CU of the Mitchell offer, advising CU of the Marshes’ intent to claim for underinsurance under the CU/Watson policy, and requesting CU’s permission to accept the proffered $25,000 policy limit from Mitchell. On June 11, 1991, the Marshes’ attorney again wrote to CU, enclosing documentation with respect to the limits of the Mitchell policy and again asking for CU’s approval of that settlement. The June 11 letter also asked CU to “acknowledge its responsibility to compensate Mr. Marsh for whatever further damages he may be able to establish that shall be within the limit of the underinsured motorists coverage under your insured’s policy.”
By letters dated June 24, 1991 and July 29, 1991, CU gave its permission to the Marshes to settle their claim with Mitchell for $25,000. The letters each closed with the claims representative’s telephone number and an invitation to call if the Marshes’ attorney had any questions. Neither letter contained any reference to any coverage defense. The Marshes proceeded to accept the policy limit from Mitchell and dismissed their action against her with prejudice on July 30, 1991.
By letter dated August 19, 1991, the Marshes’ attorney sent CU a copy of Judith Marsh’s Arbella policy[1] along with an affidavit from John Marsh attesting to the fact that he did not own any insured vehicle on the date of the accident. CU proceeded to arrange an independent medical examination of John Marsh, which took place on April 22, 1992. CU sent the Marshes’ attorney a copy of the examiner’s report on June 5, 1992, with a handwritten note that the claims representative “will contact you regarding settlement shortly.” On July 17, 1992, CU verbally communicated a settlement offer of $28,500. The Marshes’ attorney responded in writing on July 28, 1992, indicating that &e offer was far too low and that, unless CU would increase the offer substantially, the Marshes would proceed to arbitration on the amount of their underinsurance claim. CU wrote back on August 6, 1992, expressing the opinion that the Marshes appeared “intent on litigating this matter” and notifying the Marshes that the claims representative had therefore forwarded the file to counsel.
The Marshes filed for arbitration on October 30, 1992. On November 9, 1992, CU’s outside counsel wrote to the American Arbitration Association requesting a three-member panel “in light of the size of the demand and the amount of coverage available." The letter also stated that CU “reserves for the court all coverage questions relating to this claim,” but did not specificallyoutline the basis for any coverage defense or even directly assert that it had a coverage defense.
CU commenced the present action for declaratory relief in December 1992. In its complaint, CU asserted for the first time that the no-charge $10,000 per person/$20,000 per accident underinsurance set forth on the coverage selections page of Judith Marsh’s Arbella policy meant that John Marsh already had “similar coverage” under his wife’s policy and therefore could not recover any underinsurance benefits under the CU/Watson policy.
The Marshes filed their counterclaims for declaratory relief and for damages and attorneys fees pursuant to G.L.c. 93A, §9 and G.L.c. 176D, §3(9). On January 8, 1993, CU’s attorney sent the Marshes’ attorney a letter pursuant to c. 93A, §9(3), outlining CU’s coverage defenses in detail and reiterating CU’s prior settlement offer of $28,500.
DISCUSSION I. Coverage
CU denies any obligation to the Marshes based on the legislative determination to prevent “stacking” of motor vehicle insurance policies. The statute provides:
An insured who is not a named insured on any policy providing [underinsured] motorist coverage may recover only from the policy of a resident relative providing the highest limits of such coverage whether or not such vehicle was involved in the accident;... Any injured occupants who are not named insureds on a policy and who are not insured on a resident relative’s policy may obtain [underinsured] motorist coverage from the named insured’s policy covering the vehicle they occupy when injured.
G.L.c. 175, §113L(5).[2] The Commissioner of Insurance approved a mandatory endorsement to reflect this polity against stacking, providing that underinsurance benefits would be paid “unless that person has a Massachusetts motor vehicle liability policy of his or her own providing similar coverage, or is covered by a Massachusetts motor vehicle liability policy of any household member providing similar coverage.” CU invokes these provisions, arguing that John Marsh has “similar coverage" under his wife’s policy and thus may not stack the CU/Watson policy.
There is no dispute that Judith Marsh never affirmatively elected to purchase any optional underinsurance coverage. Rather, Arbella automatically included the $10,000 per person/$20,000 per accident under-insurance coverage at no charge. As this case illustrates, this “free” underinsurance coverage is not a benefit but is rather the insurance equivalent of the Trojan horse. What purports to be a gift of free insurance is instead a trap for the unwary consumer, as the presence of this worthless amount of underinsurance coverage merely serves to deprive the consumer of the benefit of any more substantial underinsurance coverage that would otherwise be available. The question, then; is whether this minimal underinsurance coverage, foisted on the consumer under the guise of a free *72 gift, can in fact be used to deprive the consumer of underinsurance benefits from some other policy.
The Marshes argue that there is no underinsurance coverage from Arbella in the absence of any premium charge and in the absence of some express decision to elect the coverage. The statute makes clear that un-derinsurance coverage is optional and that a consumer may “elect” such coverage. G.L.c. 175, §113L(2). It strains the ordinary meaning of the term “elect” to extend it, as CU argues here, to a situation in which a consumer has not indicated any desire to purchase underinsurance. CU can not claim that a consumer has “elected” this coverage merely because she has been passive upon receipt of a coverage selections page that lists it at no charge.
The Marshes also point to language in the Arbella policy to the effect that there is no coverage without a premium charge. The coverage selections page states that the policy “provides only the coverages for which a premium charge is shown.” In the Introduction to the policy, Arbella explains: “Each coverage you purchased will show a premium charge next to it. If no premium charge is shown, you do not have that coverage.” The Introduction also stresses that each item of optional insurance coverage (which would include underinsurance) is indeed optional: ‘You do not have to buy any of these seven Parts if you do not want to.” This last instruction confirms the view that optional insurance can not be forced on the consumer, even if it is for free.
CU points out that there is a “charge” filled in on the Arbella coverage selections page next to the under-insurance provision, listing the charge as “0.00” instead of leaving the column blank. Again, however, both the policy’s language and a consumer’s common sense understanding would be that, not having purchased any underinsurance, a charge listed as “0.00” does not create unintended coverage.
The Marshes also argue that, even if they technically have some form of underinsurance under the Arbella policy, it is not “similar” to the coverage provided by the CU policy and therefore not subject to the anti-stacking provisions of the mandatory endorsement. CU argues that it is “similar” because it is the same type of coverage (i.e., underinsurance coverage), simply in a lesser amount. See Plymouth Rock Assurance Corp. v. McAlpine, 32 Mass.App.Ct. 755, 757-58 (1992). The court agrees that, under McAlpine, “similar coverage” does not refer to the dollar limits of coverage but rather to the type of coverage provided.
However, in order to find that the Arbella coverage is “similar," one must first find that it in fact provides at least some form of underinsurance coverage. There is a serious question as to whether the $10,000 per person/$20,000 per accident underinsurance coverage, if it is even part of the Arbella policy, really provides any coverage at all. As coverage, it is worthless. Since vehicles are required to carry a minimum of $10,000 per person/$20,000 per accident liability coverage, providing a customer with the identical amount of “underinsurance” provides the customer with nothing.
CU argues that $10,000 per person/$20,000 per accident underinsurance coverage is not completely ” worthless, as the coverage would potentially be applicable if the accident in question involved more than two injured victims with total damages in excess of $20,000 — to the extent that the $20,000 per accident limit reduced each injured person’s recovery from the tortfeasor’s policy to below the $10,000 per person minimum, the underinsurance coverage would then be available to compensate the injured party up to the full $10,000. However, the statutory definition of “un-derinsured" requires that the “policy limit” of the tortfeasor’s liability policy be less than the underin-surance “policy limit” and that the tortfeasor’s liability policy be “insufficient to satisfy the damages of persons insured thereunder.” G.L.c. 175, §113L(2). Thus, under the statute, underinsurance is determined by comparison of the respective “policy limits,” not just by an assessment of whether the amounts actually paid by the tortfeasor’s insurer are sufficient to compensate for all damages sustained.
CU cites the case of Safety Insurance Co. v. Laurent, Civil Action No. 90-3707 (Suffolk Superior Ct., July 20, 1992) (King, J.), in support of its interpretation of an underinsurance policy providing coverage identical to the mandatory minimum liability coverage. While Safety Insurance ruled in favor of the injured passengers and awarded them up to $3,333.33 in underinsurance benefits, Safety Insurance is the only case cited by CU for the proposition that identical policy limits do not defeat a claim for nominal amounts of underinsurance. The Safety Insurance opinion notes that other jurisdictions have denied underinsurance coverage when the policy limits are identical, and notes further that there are no other Massachusetts cases addressing the issue. It is at best a close question that has yet to be resolved by any higher court. Meanwhile, as the Safety Insurance case itself illustrates, insurers who issue this free nominal underinsurance are themselves taking the position that it is meaningless since the policy limits are identical to minimum liability coverage. Thus, as a practical matter, this free coverage provides no underinsurance coverage at all. As such, it can not be “similar” to the CU policy.[3]
Finally, nothing in this court’s ruling defeats or compromises the legislative policy determination not to allow stacking of multiple insurance policies. Rather, it affirms the legislature’s determination that consumers should “elect” the amount of underinsurance coverage they wish to purchase and then be bound by that “election.” The Marshes did not elect or choose to purchase any underinsurance coverage, and are thus accepting whatever amount of underinsurance coverage (if any) exists for whatever vehicle they are traveling in. They are not being allowed to “stack” policies. On the other hand, allowing insurers to defeat legitimate claims for underinsurance by giving consumers free but worthless underinsurance in an amount identical to mandatory liability coverage *73 would effectively countenance a seriously unfair and deceptive practice in the insurance industry.[4] Allowing CU to reap the benefit of this unfair and deceptive practice is clearly contrary to the legislative purpose underlying G.L.c. 175, §113L(2) and (5).
In light of the court’s ruling on the coverage issue, it is not necessary to address the Marshes’ alternative arguments on estoppel and waiver. The court notes, however, that the issue of whether any conduct of CU caused the Marshes to change their position with respect to the Mitchell settlement poses serious issues of credibility and requires resolution of various disputed facts, making it inappropriate for summary judgment.
II. Unfair claim settlement
The Marshes complain that CU unreasonably delayed communicating its decision to deny coverage and that, prior to initiating this lawsuit, CU had in various ways effectively acknowledged its obligation to the Marshes (the only dispute being the amount of John Marsh’s underinsurance claim). This, the Marshes allege, violated various subsections of G.L.c. 176D, §3(9), and gives them the right to recover multiple damages and attorneys fees under G.L.c. 93A, §9.
CU points out, correctly, that the mere decision to litigate the novel issue of whether the Arbella policy provides “similar” underinsurance coverage is not an unfair claim settlement practice or an unfair or deceptive practice. Similarly, there is nothing in this record to suggest that CU itself has adopted the deceptive practice of including free $10,000 per person/$20,000 per accident underinsurance coverage in its own policies. Rather, the only unfair practice with which CU is charged is the many months delay in asserting its coverage defense, after repeatedly acting as if it acknowledged its coverage obligation.
Various provisions of c. 176D, §3(9) require that insurers act within a “reasonable time” or “reasonably promptly” in response to claims. See §3(9)(b) (“[flailing to acknowledge and act reasonably promptly upon communications with respect to claims”); (c) (requiring “reasonable standards for the prompt investigation of claims”); (e) (“[flailing to affirm or deny coverage of claims within a reasonable time”); (f) and (m) (requiring “prompt” settlement where liability reasonably clear); (n) (requiring insurer to “provide promptly a reasonable explanation” for denial of claim).
In the present case, §3(9) (e) and (n) are most directly applicable, as they address the issue of failure to affirm or deny coverage “within a reasonable time” and failure to provide an explanation for denial of a claim “promptly.” The undisputed facts of this case show that, as of August 1991, CU had all the information it needed to assess the coverage defense it has now raised. Yet, at no point prior to November 1992 did CU even suggest that it would deny coverage, and the basis for its denial of coverage was not revealed until the present complaint was filed in December 1992. Throughout this period, CU acted as if it did acknowledge its coverage liability — it approved the Marshes’ settlement with Mitchell, it arranged an independent medical exam of John Marsh, and it made an offer on the claim, all without any reference to the existence of any coverage defense and without even any “boilerplate” language preserving coverage defenses. A delay of fifteen to sixteen months before even intimating the existence of any coverage defense is not “reasonable” or “prompt” under the circumstances presented by this case. Compare Whitney v. Continental Insurance Co., 595 F.Supp. 939, 946-47 (D.Mass. 1984) (delay of nine months before affirming coverage, with insurer then retracting coverage decision eleven months later, violated §3(9}(b) and (n)).
CU argues that it has raised its coverage defense in a timely manner because it initiated this action within the 30-day time frame set by arbitration rules. The question is not whether CU has abided by the American Arbitration Association procedural rules governing the Marshes’ arbitration of the amount of their damages, but whether CU has complied with the standards set by G.L.c. 176D, §3(9). The question under the statute is whether the Marshes were notified reasonably promptly of CU’s decision to deny coverage and whether they were provided a reasonably prompt explanation for that denial. The time in which CU may file a lawsuit over the issue while an arbitration is pending has no bearing on CU’s utter failure for well over a year to notify the Marshes of any intent to deny coverage.
CU also argues that a violation of G.L.c. 176D, §3(9) can not be made out based on a single instance of an unfair practice. Certain subsections of §3(9) do refer to “claims,” “communications” and “settlements” in the plural, giving rise to some question as to whether an insured must establish a practice of such conduct, and not merely a single instance, in order to establish any violation of §3(9). See Van Dyke v. St. Paul Fire & Marine Insurance Co., 388 Mass. 671, 676 (1983); Swanson v. Bankers Life Co., 389 Mass. 345, 349 n.5 (1983). However, despite that as yet unresolved legal issue, CU has also violated §3(9) (n), which refers to failure to provide a prompt explanation for denial of a “claim.” Subsection (n) is thus violated by a single act, without regard to any pattern or practice. Trempe v. Aetna Casualty & Surety Co., 20 Mass.App.Ct. 448, 456-57 (1985). Furthermore, the Marshes have brought their counterclaim under G.L.c. 93A, §9, which allows recovery for a single unfair or deceptive act and which expressly incorporates the standards of c. 176D, §3(9). Thus, the fact that the Marshes complain of only a single claim incident does not insulate CU from liability.
III. Damages
The Marshes have suggested various measures of damages allegedly flowing from CU’s delay in denying coverage. While this court is satisfied that the Marshes have suffered injury, that injury is simply a brief delay in the receipt of their funds, an injury that is normally compensated by way of an award of interest.
To the extent that the Marshes are arguing that a prompt denial of coverage would have altered their *74 decision with respect to the Mitchell settlement, such a theory can not stand. The Marshes did not provide CU with a copy of the Arbella policy (from which CU’s coverage defense could be gleaned) until August 1991. The Marshes had already settled with Mitchell one month earlier. CU’s delay in raising its coverage defense for sixteen months after receiving the Arbella policy simply can not have “caused” anything with respect to the previously concluded Mitchell settlement. The violation that this court has found postdates the Mitchell settlement, and can not give rise to any reliance damages with respect to that settlement.
Furthermore, where this court has ruled that CU’s coverage defense is not legally correct, the Marshes will (after arbitration of the amount of their damages) recover under the CU policy. They have ultimately obtained the benefit of the underinsurance coverage they thought they had when they settled with Mitchell — they have simply encountered additional delay in receiving it.
The court also agrees with CU that the ultimate arbitration award, which will establish the amount of the underinsurance claim, is not a measure of damages for the delay. See Bertassi v. Allstate Insurance Co., 402 Mass. 366, 372 (1988); Wallace v. American Manufacturers Mutual Insurance Co., 22 Mass.App.Ct. 938, 940 (1986) (rescript). Nor can the arbitrator’s award itself be doubled or trebled as multiple damages under G.L.c. 93A, §9 when it is not a “judgment.” Bonofiglio v. Commercial Union Insurance Co., 411 Mass. 31 (1991).[5]
With respect to damage caused by the delay itself, CU argues that the Marshes did not file for arbitration until October 1992 and thus have not been harmed by CU’s delay in denying coverage. While the Marshes’ own delay in filing for arbitration does reduce the injury suffered as a result of CU’s belated denial of coverage, it does not completely eliminate it. Had CU promptly denied coverage, there is no doubt that the present suit would have been commenced (either by CU itself or by the Marshes) at a much earlier date, with the coverage issue thus being resolved well prior to the date of this opinion. The delay in actual recovery of funds that can be traced to CU’s delay in denying coverage is thus equivalent to the time from the filing of this suit (December 1992) until the date of this order sending the matter to arbitration. Thus, once the amount of the Marshes’ underlying claim is ascertained, damages should be computed and awarded in the amount of seven months’ worth of interest on that award. Bertassi supra-, Wallace, supra.
IV. Multiple damages and attorneys fees
The Marshes also seek multiple damages and attorneys fees pursuant to G.L.c. 93A, §9(4). CU asserts that its settlement offer of $28,500was a reasonable offer that prevents the award of multiple damages and attorneys fees. There is no dispute that CU’s offer was made timely in response to the filing of the Marshes’ counterclaim. The parties dispute whether the offer wasjfreasonable.”
On the present record, this court is unable to assess the reasonableness of CU’s offer. The offer itself was made, not simply with respect to compensation for delay, but with respect to the entire underinsurance claim. The parties vigorously dispute the value of John Marshes’ injuries — that is why they are going to arbitration. This court can not, in the presence of that dispute, determine as a matter of summary judgment the “reasonableness” of CU’s settlement offer. Until the results of the arbitration are known, there is no damages finding to which the CU settlement offer can even be compared. While the amount of the arbitration award is not absolutely decisive on the issue, it is a useful yardstick for assessing how far off CU’s offer was. If the result of the arbitration is an award only slightly higher than the proffered $28,500, this court would find CUs offer reasonable. If the award is well in excess of CUs offer, that offer might not shield CU from multiple damages (i.e., multiple interest) and attorneys fees.
Furthermore, since this court will not penalize CU for its decision to litigate the novel coverage issue posed by these facts, any assessment of the reasonableness of CU’s settlement offer must also allow some leeway for the uncertainty on the coverage issue at the time the offer was made — ie., CU could reasonably discount its offer by an amount to take into consideration the possibility that it might not have any liability at all.[6] Thus, unless the arbitration award ultimately made to the Marshes is substantially and dramatically in excess of CU’s $28,500 offer, multiple damages and attorneys fees would not be appropriate.
Accordingly, summary judgment as to CU’s liability for multiple damages and attorneys fees is denied at this time, without prejudice to either side renewing its motion following the outcome of the arbitration.
ORDER
For the foregoing reasons, plaintiffs motion for summary judgment is DENIED, and defendants’ motion for summary judgment is GRANTED in part as follows;
1. On plaintiffs complaint for declaratory relief, summary judgment is GRANTED in favor of defendants;
2. On defendants’ counterclaim for declaratory relief, summary judgment is GRANTED in favor of defendants/plaintiffs-in-counterclaim, and a declaratory judgment shall enter declaring that defendants are entitled to underinsurance benefits under the policy plaintiff issued to Watson;
3. On defendants’ counterclaim pursuant to G.L.c. 176D, §3(9) and G.L.c. 93A, §9, summary judgment is GRANTED in favor of defendants/ plaintiffs-in-counterclaim as to liability for single damages in the amount of seven months’ interest on the amount of defendants’ arbitration award and DENIED as to defendants’ claim for multiple damages and attorneys fees.
It is hereby further ORDERED (1) that the parties proceed to arbitration of their underinsurance dispute and (2) that the parties file a written status report with the court within two weeks of receipt of the arbitrator’s decision, specifying the results of the arbitration and *75 outlining the parties’ respective positions as to the remaining damages and attorneys fees issues.

 The policy sent was actually the Arbella policy on the vehicle Ms. Marsh had owned prior to the Volvo. The under-insurance provisions set forth on the coverage selections page were identical to those set forth on the later policy on the Volvo — i.e., any coverage defenses available to CU on account of the underinsurance coverage on the Arbella policy were ascertainable from the policy sent to CU in August 1991.

 Subsection (5) as worded covers claims for uninsured benefits. However, subsection (2) provides that the term “uninsured motor vehicle” will also include underinsured vehicles when underinsurance coverage has been purchased.

 Another judge of this court has reached the same conclusion and has held that free $10,000 per person/$20,000 per accident underinsurance is not “similar” to an underinsurance policy providing coverage above the mandatory minimum liability coverage. See Thompson v. Travelers Insurance Co., Civil Action 91-2885 (Suffolk Superior Ct., July 20, 1992) (King, J.).

 In the present case, the practice in question was undertaken by Arbella, which is not a party to this action. However, from this case, the Thompson case, and the Safety Insurance Co. case, supra, it is apparent that various other insurers have adopted the practice of putting $10,000 per person/$20,000 per accident underinsurance coverage into their policies without regard to any election on the part of the insured. The present record does not reflect whether CU is also providing such free underinsurance coverage to its customers.

 Similarly, this court will not allow some procedural ruse to avoid the clear import of Bonofiglio. See Hanna v. Berkshire Mutual Ins. Co., Civil Action No. 92-5082 (Suffolk Superior Ct., April 2, 1993) (Flannery, J.).

 In fact, CU did not use its belated coverage defense as an excuse to reduce its settlement offer. Rather, despite the existence of the defense, CU reiterated the same offer it had made six months earlier at a time when it posed no coverage defense at all. CU is entitled to some credit for its good faith in not reducing the offer once the coverage defense was identified.