ROBERT YEAGLE *vs.* AETNA CASUALTY & SURETY COMPANY.

No. 95-P-2164.

Middlesex. January 16, 1997. - May 20, 1997.

Present: WARNER, C.J., KAPLAN, & IRELAND, JJ.

*Consumer Protection Act,* Insurance, Damages, Offer of settlement, Unfair or deceptive act. *Insurance,* Motor vehicle insurance, Settlement of claim, Unfair act or practice.

In an action brought against an insurer for violation of G. L. c. 176D, § 3(9)(f), and c. 93A, § 2, in which the judge declined to find that the insurer acted in bad faith or knowingly or wilfully in violation of the statutes so as to warrant multiple damages under G. L. c. 93A, § 9(3), the judge incorrectly calculated the single damage award to be the amount of the judgment in the underlying claim rather than the amount "caused" by the unfair practice: the matter was remanded for recalculation of damages in accordance with the holding of *Clegg* v. *Butler,* 424 Mass. 413, 423-425 (1997). [652-656]

CIVIL ACTION commenced in the Superior Court Department on October 5, 1989.

The case was heard by *Howard J. Whitehead,* J.

*Nicholas J. Nesgos* for the defendant.

*Stewart A. Engel* for the plaintiff.

KAPLAN, J. In summary, the judge found as follows in this action under G. L. c. 93A, the Consumer Protection Act. The plaintiff Robert Yeagle, on January 28, 1988, seated in his van, was waiting in line at the Weston toll booth on the Massachusetts Turnpike. A tractor-trailer, at high speed, rear-ended a car that in turn rear-ended Yeagle. The trailer was owned by C.W. Horse Transportation, Inc. (C.W.), and operated at the time by C.W.'s employee James Sacco. Yeagle suffered soft tissue injuries to his neck and left shoulder. He was treated at Newton-Wellesley Hospital and had further visits with two physicians and a chiropractor. He lost several weeks work as a union electrician and claimed to have lost part-time assignments as a special police officer in Wellesley.

Aetna Casualty & Surety Company (Aetna), C.W.'s automobile liability insurer, provided coverage of one million dollars for this kind of event. It received prompt notice of the accident, conducted an investigation, and concluded that its insured was one hundred percent responsible. Yeagle retained Mr. Glen Shriberg as counsel (on a contingency basis) and Aetna referred the matter to Mr. Brian Finnerty. Shriberg filed suit against C.W. on June 21, 1988, in Middlesex Superior Court.

In a letter of October 19, 1988, an Aetna claims representative, Andrew Whitney, broached settlement to Shriberg conceding that "liability appears reasonably clear." Shriberg suggested $200,000 and Whitney countered with an offer of $10,000. At that point Whitney had answers to interrogatories indicating that Yeagle's medical expenses were approaching $2,335 and lost earning capacity $19,260. Whitney set reserves at $20,000.

Another claims representative, Louis Drouin, took over in December, 1988. Shriberg said Yeagle's special damages were now about $30,000 and injuries to Yeagle's neck and shoulder were permanent. Drouin, skeptical of permanent damage, in February, 1989, raised the settlement offer to $12,000. Reserves, however, remained at $20,000 although Drouin in an internal report of July 31, 1989, appeared to acknowledge special damages of $16,000 and general damages of an additional $30,000.

On April 12, 1989, Shriberg had sent Aetna a formal demand letter under G. L. c. 93A, § 9(3), asserting that Aetna had engaged and was engaging in unfair settlement practices in violation of G. L. c. 176D, § 3(9). Aetna replied with denials on May 9. Yeagle commenced the present action against Aetna on October 5, 1989, grounded on the statutes just cited.

By June, 1989, Aetna's designated physician had examined Yeagle and reported that he had made an excellent recovery though still complaining of shoulder pain. Discovery, including a deposition of Yeagle, was virtually complete by January, 1990. Discovery "reasonably established," as the judge said, that Yeagle had experienced significant physical pain and there was evidence of ongoing limited shoulder pain as well. Drouin authorized Finnerty to make an offer of $20,000 and set reserves at $35,000. Finnerty raised Aetna's offer to $15,000. Shriberg repeated his settlement figure of $200,000.

The lawyers on February 21, 1990, attended a conciliation conference with a retired judge. The judge put an evaluation of $70,000 on the claim. Shriberg reduced his figure to $125,000 and Finnerty offered $20,000. At a final conciliation conference a week later, Finnerty offered $30,000. Shriberg said he "would recommend" that his client accept $70,000.[1] There is no indication of further settlement talk.

Yeagle's action against C.W. went to trial in June, 1990. The jury returned a verdict of $75,000 which, with interest added from the commencement of the action, June 21, 1988, to the date of judgment, June 27, 1990, came to $94,015, and costs. (Yeagle had unreimbursed out-of-pocket expenses of $3,300, mostly expert witness fees.)

On the facts just recounted and the opinions of the parties' respective experts about settlement practices (which we do not rehearse), the judge in the present action decided that "Aetna's refusal to offer more than $30,000 from February 28, 1990, until the case was tried to a verdict in June, 1990, was inconsistent with an effort to effectuate a 'prompt, fair and equitable' settlement of the claim." (See c. 176D, § 3[9][f].) By the former date, Aetna had the evaluation of a competent conciliator that the case was worth $70,000 and had itself set reserves of $35,000. It was apparent from Shriberg that the plaintiff likely would accept $70,000. Thus: "The time for posturing had passed, and the time to make a realistic offer was at hand. Yet, Aetna persisted in making an offer below the $35,000 level of its reserves and well below the apparent real value of the claim."

The judge found a violation of c. 176D, § 3(9)(f), and c. 93A, § 2, but declined to find that Aetna acted in bad faith or in wilful and knowing violation, which would have called for multiple damages under c. 93A, § 9(3). As single damages, the judge took the amount of the underlying tort judgment against C.W., $94,015, and added interest thereon of $59,448.[2] The judge also awarded attorney's fees of $23,510 (undisputed), and costs.

In his memorandum of decision, the judge said, without

---

[1]Shriberg testified that he told Finnerty and the judge that his client would accept $70,000. The testimony was disputed. The judge proceeded on the basis that Shriberg said he would "recommend."

[2]Interest from October 5, 1990, the date of the filing of complaint to the date of decision, January 11, 1995.

supporting analysis, that c. 93A, § 9(3), as amended, "provides for recovery in the amount of the judgment which the plaintiff ultimately recovered on the claim itself, to wit: $94,015.00." As it turns out, only Aetna appeals to this court and the question chiefly argued is the correctness of this assumption by the judge. Yeagle did not appeal; he accepted the finding that Aetna did not act in bad faith.

The ruling that single damages equate with the judgment on the underlying claim hangs on the judge's reading of an amendment of c. 93A, § 9(3), approved on December 5, 1989, and going into force on March 5, 1990. We set out a portion of § 9(3) with the amendment italicized:

> "[I]f the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a wilful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith or with knowledge or reason to know that the act or practice complained of violated said section two. *For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim.*"

We believe the judge's reading of the amendment was incorrect. A different interpretation has been intimated, as we think, in a number of decisions including *Clegg* v. *Butler*, 424 Mass. 413, 423-425 (1997), published while the instant appeal was pending. We develop the proposition briefly.

(1) The sentence preceding the amendment tells us that single recovery shall be "the amount of actual damages," meaning the (foreseeable) loss to the claimant caused by the violation, this amount to be doubled or tripled where the violation was in bad faith. The amendment goes on to say that in the particular situation where a claimant has recovered a judgment on the underlying claim, "actual damages" shall be taken to be the amount of the judgment for the purpose of

bad faith multiplication (and for that purpose only). Thus the limitation of function expressed in the amendment — "the amount of actual damages to be multiplied by the court." A reading that the judgment is also the measure of single damages seems to us to go beyond the text and to be implausible as an ordinary lexical exercise.[3]

(2) The interpretation of the amendment just suggested is reinforced when we consider the "mischief" the amendment was manifestly intended to correct.[4]

It was long understood that damages under c. 93A, § 9(3), were those "caused" by the unfair practice, as distinct and different from any recovery on the underlying claim. See *Di-Marzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 101-102 (1983); *Shapiro* v. *Public Serv. Mut. Ins. Co.*, 19 Mass. App. Ct. 648, 657 (1985); *Trempe* v. *Aetna Cas. & Sur. Co.*, 20 Mass. App. Ct. 448, 457 (1985); *Wallace* v. *American Mfrs. Mut. Ins. Co.*, 22 Mass. App. Ct. 938, 939-940 (1986). So, on the facts of the present case, the $94,000 tort recovery would not be translated to become the measure of the single damages or the base for multiple damages in the c. 93A action. In that action the plaintiff would be entitled to a sum compensating him for that delay in attaining recovery for the tort which was caused by the insurer's wrongful settlement practice, or, in case of the insurer's bad faith tactics, double or triple the compensatory sum. The plaintiff would thus obtain what amounted to interest figured on the tort recovery for the period of the wrongful withholding (or the multiple of this interest). See *Clegg* v. *Butler*, 424 Mass. at 424, citing *Greelish* y. *Drew*, 35 Mass. App. Ct. 541, 542 n.3 (1993).

Now there could be dissatisfaction with the "interest" basis

---

[3]See also Hailey, New Incentive for Insurers to Settle Claims Reasonably and Promptly, 34 Boston Bar J. 16, 18 (Sept./ Oct. 1990); Boyle, The Elimination of Causation in 93A Actions Against Insurers, 35 Boston Bar J. 14, 15 (Jan./Feb. 1991); Young, Chapter 93A and The Insurance Industry in Chapter 93A Rights & Remedies, § 14.20 (Mass. Continuing Legal Educ. 1989 & Supp. 1996).

[4]"In all cases the object is to see what is the intention expressed by the words used. But, from the imperfection of language, it is impossible to know what that intention is without inquiring farther, and seeing what the circumstances were with reference to which the words were used, and what was the object, appearing from those circumstances, which the person using them had in view; for the meaning of the word varies according to the circumstances with respect to which they were used." Lord Blackburn in *River Wear Commrs.* v. *Adamson*, L.R. 2 A.C. 743, 763 (H.L. 1877).

of calculation in the type of c. 93A case where a defendant insurer had acted in bad faith in declining reasonable settlement and the plaintiff had been obliged to try to the end an action on the underlying claim. In such cases it might appear to some onlookers that multiplication of the mere interest element would often not serve as sufficiently punitive of the defendant malefactors. Hence the 1989 amendment, which threatened a bad faith defendant with multiplication of the amount of the judgment secured by the plaintiff on his basic claim — a total that might be many times over the interest factor, was arbitrary in the sense that it exceeded the injury caused by the c. 93A violation, and worked an in terrorem addition to what was already a punitive sanction. It is common ground that the amendment was inspired by multiplication cases of the kind mentioned. See *Bertassi* v. *Allstate Ins. Co.*, 402 Mass. 366, 372-373 (1988); *Trempe* v. *Aetna Cas. & Sur. Co.*, 20 Mass. App. Ct. at 457; *Wallace* v. *American Mfrs. Mut. Ins. Co.*, 22 Mass. App. Ct. at 939-940. The opinion in *Clegg* v. *Butler*, 424 Mass. at 424, confirms that the amendment "was apparently enacted in response to cases such as" the three just cited. See also *Greelish* v. *Drew*, 35 Mass. App. Ct. at 542 n.3; *Cohen* v. *Liberty Mut. Ins. Co.*, 41 Mass. App. Ct. 748, 753-754 (1996) (both remarking on the origin of the amendment). Single damages, we suggest, were not within the orbit of legislative attention.[5]

(3) Since its enactment in 1967, c. 93A, the Consumer Protection Act, has maintained a line of distinction between violations that consist of unfair or deceptive acts or practices, simpliciter, and those that are knowing or wilful or actuated by bad faith. The former are sanctioned by compensatory "single" damages. Damages for the latter more serious violations are avowedly punitive — and can be very heavily so when the amendment applies. The effect of making single damages correspond with the judgments secured on the underlying claims — the nub of the decision below — would

---

[5]Multiple, not single, damages were at stake in cases where the amendment was applied, *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 716 (1990); *Cohen* v. *Liberty Mut. Ins. Co.*, 41 Mass. App. Ct. at 756, and in others where the amendment was considered but failed of application for particular reasons, *Bonofiglio* v. *Commercial Union Ins. Co.*, 411 Mass. 31, 37 (1991) (arbitral award not a "judgment"); *Schwartz* v. *Rose*, 418 Mass. 41, 47 (1994) (special problem of damages upon rescission); *Clegg* v. *Butler*, 424 Mass. at 424-425 (settlement not a "judgment").

be to cross the established line, to change the character of the sanction for the lesser violations and load it with a punitive factor. It is one thing to aggravate multiple awards, as the amendment does. It is another thing to redesign single awards and make these punitive also. Before such a structural change is introduced and enforced by the courts there ought to be better evidence than we can find of a legislative purpose to encompass it by the terms of the amendment.[6]

The judgment is reversed and the case is remanded for recalculation of damages.

*So ordered.*

---

[6]Our basis for decision of the appeal moots the insurer's contentions that the judge gave improper retroactive application to the amendment, as the c. 93 action was pending on the amendment's effective date; and that the amendment should be held not to apply because the claim against C.W. did not arise from the same transaction or occurrence as the c. 93A action (as to which see *Clegg* v. *Butler,* 424 Mass. at 426).