McHugh, J.
Background
This is a case in which plaintiffs, Thomas and Patricia Griffin, seek to recover damages from defendant, Commercial Union Insurance Company (“Commercial Union”) for what they contend were Commercial Union’s unfair claims settlement practices in connection with a personal injury and loss of consortium claim arising out of an automobile accident that took place on January 16, 1988. The case was tried without a jury..Based on the stipulated facts, the exhibits and testimony introduced during the course of the trial, and the reasonable inferences I have drawn from all of those sources I find and conclude as follows:
Findings of Fact
Thomas and Patricia Griffin, the plaintiffs, are husband and wife and at all material times have lived at 14 Vincent Street in Billerica, Massachusetts. Commercial Union is an insurance company that does business in the Commonwealth of Massachusetts. Among other things, Commercial Union was at all material times in the business of providing automobile insurance and processing claims that arose under the policies of insurance it had issued.
On January 16, 1988, Patricia Griffin was injured in an automobile accident. The accident took place at an intersection. Commercial Union’s insured, Eric Coombs, drove through a stop sign without stopping and crashed into Ms. Griffin’s car. For that act, Mr. Coombs was issued a citation at the scene by the investigating police officer.[1] At the time and later, Mr. Coombs claimed that he had had some difficulties with his brakes but, according to the investigating officer’s report, the brakes were in good working order immediately after the accident. Ms. Darlene Angelo, a passenger in Mr. Coombs’s automobile, later asserted that the stop sign had been obscured by overhanging shrubbery. Mr. Coombs never blamed the accident on overhanging shrubbery, however, and the bushes ultimately received little if any attention at trial.
The force of the accident turned Ms. Griffin’s car, a 1984 Mercury Capri, 180 degrees. The impact so damaged the car that her insurer, USF&G, declared it a total loss and ultimately paid her and her husband $6,090.00 for that loss.
As a result of the accident, Ms. Griffin suffered a concussion, a cervical strain, swelling of her face and jaw and bruises. She was taken from the scene by ambulance to the St. John’s Hospital in Lowell where she was treated, held overnight and released the following day. Thereafter, she was out of work for five weeks. At the time, she was earning a little more than $400 per week and thus lost approximately $2,000 in wages as a consequence of the accident. She returned to work on or about March 1, 1988 and lost no more time from her employment thereafter.
Commercial Union had issued to Mr. Coombs a standard Massachusetts motor vehicle insurance policy with limits of $100,000 per person and $300,000 per accident. Commercial Union learned of the accident from Mr. Coombs, shortly after the accident occurred. By mid-February, Commercial Union had received a notice of lien from St. John’s Hospital stating that Ms. Griffin’s medical bills amounted to $1,445.85. At least by the end of April, Commercial Union had received a copy of the police report, avarieiy of documents from USF&G seeking reimbursement for the properly damage and personal injury protection or PIP payments, see G.L.c. 90, §34M, USF&G had made to the Griffins. Concluding that Mr. Coombs was at fault in the accident, Commercial Union made both payments. From a search of a nationwide database, Commercial Union also learned that Ms. Griffin had not filed prior personal injury claims. It knew from the *111 outset, therefore, that she was not a professional claimant.
Little more information was conveyed to Commercial Union about the accident or about the injuries to Ms. Griffin until suit was commenced in March of 1991. Four individuals played principal roles in the events that unfolded thereafter. Janice C. Nigro, Esq., an attorney with the firm of Nigro, Pettepit and Lucas in Wakefield, Massachusetts represented Ms. Griffin. Donald E. Feener, Esq. of the Law Offices of Robert E. Noonan in Boston represented Commercial Union. The claims adjuster was Patricia M. Mollon and her supervisor was Charles J. Connon.
Suit was commenced without prior notice to Mr. Coombs or to Commercial Union on or about January 7, 1991, nearly three full years after the accident. After suit was filed, routine discovery began and proceeded without significant impediment. As Mr. Feener received information from Ms. Nigro, he sent that information to Ms. Mollon. Among other things, the medical information obtained during the course of discovery revealed that x-rays taken on the date of the accident of the skull, cervical spine, both knees, left hand and chest were unremarkable. A cranial CT-scan likewise was unremarkable. Upon her discharge from the hospital the day after the accident, Ms. Griffin complained of headaches and general body aches and pain. The discharge diagnosis was a cerebral concussion, a cervical sprain and multiple contusions of the forehead and both knees. The medical records Commercial Union received during the course of discovery also revealed that an examination by an oral surgeon on February 11, 1988 was unremarkable.
Through discovery, Commercial Union learned that Ms. Griffin began treating with New England Neurological Associates on February 16, 1988 and that treatment continued to February 27, 1990. By February 27 of 1990, she was complaining principally of pain in the back of the neck with an occasionally burning sensation to the left shoulder. There were no objective signs of injury that accounted for that pain. In November of 1989, plaintiff began treating with Paul J. McLaughlin, a chiropractor in Burlington. X-rays Dr. McLaughlin took revealed, among other things, some “hyflection pathologies at C2/3 and 3/4.” Dr. McLaughlin concluded that Ms. Griffin was likely to experience degenerative changes in the cervical region in the future, that those degenerative changes would be causally related to her accident and that, in November of 1991, she had a 10% whole body permanent physical impairment and loss of physical function as a result of the accident. The record does not disclose Ms. Griffin’s receipt of any medical treatment after December of 1990.
Plaintiffs deposition, and that of her husband, were taken in the fall of 1991 as was the deposition of Mr. Coombs. A so-called independent medical examination of Ms. Griffin resulted in the examiner’s conclusion that Ms. Griffin was suffering from no permanent injuries although the examiner did note that she was complaining of residual pain in her neck and left shoulder. The examiner also concluded that Ms. Griffin had had a cervical sprain with tendinitis of the left shoulder, and that she had had five weeks of complete disability and twelve months of partial disability after the accident, all of which the examiner causally related to the accident of January 16, 1988.
By late July and early August of 1991, both Mr. Feener and Mr. Connon knew that the liability of Commercial Union’s insured, Mr. Coombs, was reasonably clear. Mr. Connon, based on the medical information he had available to him and the fruits of discoveiy before August, gave Mr. Feener authority to settle the case for $15,000. By that time, however, Mr. Feener had not received a demand from Ms. Nigro and consequently he elected not to make any offer to her at that time.
In March of 1992, Ms. Mollon reviewed Ms. Griffin’s claim as part of a periodic review Commercial Union employees undertook with respect to pending claims. As part of that review, Ms. Mollon prepared a “claim evaluation” form Commercial Union routinely used as a tool for formulating settlement offers. By March of 1992, Commercial Union knew that Ms. Griffin’s total medical bills were $8,098, that her lost wages were $2,048, that she had been totally disabled for four weeks,[2] and had had a partial disability for an additional 52 weeks.[3] As was customary at Commercial Union, Ms. Mollon assigned a value of $500 per week to the period of total disability and a value of $350 per week to the period of partial disability. In that fashion, Ms. Mollon determined that the “full value” of Ms. Griffin’s claim was $30,346. From that amount, Ms. Mollon subtracted $2,000.00 to account for the PIP payments Ms. Griffin already had received and derived a revised “full value” of $28,246.00. To that amount, Ms. Mollon assigned an 80% liability assessment to derive a “settlement value” of $22,676.80 and a settlement “range” of $15,000 to $23,000. Ms. Mollon’s 80% liability assessment apparently was based on the assertion, unsupported by any objective evidence, Mr. Coombs had made regarding brake trouble and the assertion made by his passenger, Ms. Angelo, to the effect that the stop sign had been obstructed by overhanging brush. No one suggested, and Commercial Union did not believe, that any part of the 20% discount for liability was due to any comparative negligence on Ms. Griffin’s part.
After completing her analysis, Ms. Mollon wrote to Mr. Feener to ask whether he had received a demand from Ms. Nigro. He had not. Stimulated by Ms. Mollon’s inquiry, however, he asked Ms. Nigro to give him one. She responded orally with a demand for the full policy amount of $100,000.00. Mr. Feener told her in response that there were no objective signs to account for Ms. Griffin’s complaints of pain and that *112 a juiy would be highly unlikely to award Ms. Griffin anything approaching $100,000.00. Ms. Nigro responded that she had no idea what a jury would do, that a juiy was free in fact to do as it wished but that $100,000.00 was her demand and that she would spell out the reasons for that demand in writing promptly. Mr. Feener communicated the results of his discussion to Ms. Mollon.[4]
Shortly after Mr. Feener’s discussion with Ms. Nigro and before Ms. Nigro sent him her written demand, Mr. Connon prepared a six-month supervisoiy review form routinely used by Commercial Union to set reserves on pending cases. The form Mr. Connon used differed from the one Ms. Mollon had used to make her analysis and, in fact, the two forms are used for different purposes, Ms. Mollon’s for purposes of deciding what offers to make and Mr. Connon’s for deciding what should be held in reserve for the total amount the claim is likely to cost.[5] Based on all of the information at his disposal, Mr. Connon placed the full value of the case at between $22,500 and $28,500 with an 80% “exposure factor.”[6] That 80% “exposure factor,” like the 80% liability factor used earlier by Ms. Mollon, was based on potential excuses for Mr. Coombs’s conduct, not on any assumption or assertion that Ms. Griffin was comparatively negligent.
On May 8, 1992, Ms. Nigro wrote to Mr. Feener with her settlement demand. She stated, accurately, that Ms. Griffin had incurred total medical bills in the amount of $8,384.31, that she had lost five weeks from her work at $409.60 per week for a total lost wages of $2,048, that Mr. Griffin had a viable loss of consortium claim and that Ms. Griffin continued to have pain in her neck and upper arm. In formulating the settlement demand, Ms. Nigro said as follows:
Ms. Griffin’s specials to date alone amount to more than $10,000. Because she is suffering from a chronic soft-tissue injury, it is difficult to project future specials. Should surgery be required, projections of medical expenses range from $10,000-$17,000. As to future pain and suffering, even a conservative five dollars per day for residuals for her life expectancy (42.7 years) discounts to a present value of approximately $60,000.
Ms. Nigro thus reiterated her demand for $100,000, the full amount of the policy.
At the time Ms. Nigro wrote her May 8 letter, her sole basis for discussing the possibility of surgery was a statement in the letter of Dr. McLaughlin, Ms. Griffin’s treating chiropractor, that Ms. Griffin’s “clinical picture [included] a strong possibility that surgical intervention [would] at some time be necessary in order to secure the unstable vertebral motor units.” The nature, extent and purpose of the surgery was not discussed or described in Dr. McLaughlin’s letter nor was the surgery’s likely cost. Indeed, Ms. Nigro had no firm estimates of the likely surgical expenses at the time she wrote her letter.
The demand Ms. Nigro made in her letter of May 8, 1992 was not a reasonable demand for the case based on the information that had been developed to that point. There were no objective signs to explain the pain that Ms. Griffin claimed to have had in the accident’s wake. There was no basis whatsoever for contending that the pain she experienced in the aftermath of the accident was likely to be permanent. Any assertion that surgery was in Ms. Griffin’s future rested solely on the statement of Dr. McLaughlin who clearly was not a surgeon and who spoke only of strong possibilities, not of reasonable likelihood. Ms. Griffin had lost no time from work following her return five weeks after the accident and, by May of 1992, had not had any medical treatment of any kind in approximately seventeen months.
On the basis of the information then at its disposal, Commercial Union’s “full value” assessment of the case at approximately $30,000 was much more reasonable. There was no realistic basis, however, for Commercial Union to assign an 80% liability factor to that full value, for none of the information it had by then developed would support much more than a hope that good fortune at trial would somehow trump the absence of provable facts. Neither at the time Ms. Nigro made her written demand nor at any time in the immediate aftermath of that written demand, however, did Commercial Union make any offer at all.
On or about April 4, 1992, Ms. Mollon again looked at the case with an eye toward deriving a settlement value. This time she concluded that it had a full value of $36,132.31. That “full value" used the same amounts for medical bills and lost wages she had used in her earlier analysis, used five, instead of four, weeks for total disability and used a figure of $5,000 (the source of which is not revealed by the record) for the 10% permanent whole body impairment recited in Dr. McLaughlin’s letter. Ms. Mollon’s April 4 analysis was prompted by a call from Mr. Feener asking whether, in light of all of the information Commercial Union had received about the case and in light of Ms. Nigro’s demand, his authority remained at $15,000 and, if so, what his instructions were.
Ms. Mollon sent her analysis to Mr. Connon with a request for instructions for Mr. Feener. Mr. Connon told Ms. Mollon to have Mr. Feener offer the $15,000 he previously had been authorized to offer and procure with that offer a “counter demand” from Ms. Nigro. Mr. Feener promptly offered the $15,000.00 to Ms. Nigro and told her that he was doing so in order to procure from her a revised demand. Ms. Nigro responded that she would reduce her demand, in light of the offer, to $90,000 but that her reduced demand would remain open only for two weeks. At the time she made the $90,000.00 demand, Ms. Nigro did not believe that $90,000.00 was the value for which the case should, or likely would, settle. She reduced the demand, however, in an effort to see if she could procure another *113 upward movement by Commercial Union. Mr. Feener communicated to Ms. Motion Ms. Nigro’s reduced demand.
On October 19, 1992, in response to Ms. Nigro’s demand, Mr. Connon performed another review of the case and determined for purposes of determining whether the reserves should be adjusted. At the time the reserve for damages was $22,400.[7] Mr. Connon concluded that the full value of the case ranged between $23,300 and $39,000 with an 80% liability likelihood. As a result, he further concluded that the existing reserve was inadequate and should be increased by $8,800 to $31,200. On the same day, he sent a letter to Mr. Feener increasing the latter’s authority to $25,000 and telling him that his next offer should be $21,000.
After Mr. Connon sent that letter, Mr. Connon or Mr. Feener, or both, engaged a private detective firm to conduct some surveillance with respect to Ms. Griffin’s activities. Surveillance revealed that she was apparently unimpaired and unencumbered in her daily activities by any of the pain from which she claimed she was suffering.[8] Following that surveillance, Mr. Feener offered Ms. Nigro the $21,000 Mr. Connon had suggested he offer. Ms. Nigro responded with a demand of $65,000 but said that the demand would only remain open for a short period of time.
In January of 1993, the case was called for a pre-trial conference in Lowell before Superior Court Justice Regina Quinlan. At the pre-trial conference, there were no settlement discussions but Justice Quinlan ordered that the case go to a conciliator to see if it could be resolved. That order prompted another claim evaluation by Mr. Connon, this one for purposes of deriving a settlement offer. As a result of that review, Mr. Connon concluded that the case had a full value of $24,735, a settlement value of $20,500 and a settlement range of between $18,500 and $22,500. The new evaluation included nothing for Ms. Griffin’s claimed permanent partial disability and reduced the amounts per week for total and partial disability from $500 to $450 and from $350 to $225 respectively. In this evaluation, Mr. Connon set his liability estimate at “80-100%” and used 90% to calculate his settlement value. There was no apparent reason for the changes from the earlier claim evaluation performed the previous October except for the increase in the liability evaluation from 80% to a much more realistic 90%. Indeed, 95% would have been more realistic yet.
In any event, the conciliation occurred on March 3, 1993. The conciliator was a lawyer who practiced in the Lowell area and who had extensive knowledge of personal injury actions generally and automobile tort actions in particular. Mr. Connon attended the conciliation as did Ms. Griffin. By the time the conciliation began, Ms. Nigro had withdrawn her demand of $65,000 and had returned to the $90,000 she had demanded before Commercial Union had increased its offer from $15,000 to $21,000. Commercial Union’s offer remained at $21,000. The conciliator, after discussing the case with the parties said that he believed the case had avalué of approximately $50,000.[9]
Neither side altered its position regarding settlement in response to receiving that evaluation. Mr. Connon, although stating in his most recent settlement evaluation that the case had a “full value” of $24,735 and a settlement value of $20,500, had set a reserve of $31,200.00 by applying an 80% liability likelihood to a top value of $39,000.00. In making his settlement evaluation, however, he had used a more realistic liability likelihood of 90%. Had he applied that likelihood to the top value he used for the purpose of setting reserves, he would have obtained a reserve value of $35,100, an amount slightly less that the $36,000.00 Ms. Mollon had determined a year earlier was the case’s full value. I therefore find that Commercial Union in fact believed after the conciliation that, although its exposure was higher, the case had a realistic value of approximately $35-36,000.
After the conciliation, Ms. Nigro in fact did not have in her own mind a value for the case and did not know, contemporaneously or at the trial of this case, what she would have recommended at the conciliation to settle the case had realistic movement toward settlement then begun.
The parties had no further settlement discussions in the immediate aftermath of the March 3 conciliation. They next met at a pre-trial conference before Justice Kelley on April 12,1993. There, some settlement discussions occurred and, after listening to the presentation made by both sides, Justice Kelley opined that commercial Union’s offer of $21,000 was low and should be increased if Commercial Union truly desired to settle the case. Justice Kelley mentioned no particular settlement figure nor did he mention a suggested amount by which the settlement offer should increase.
At the conclusion of the pre-trial conference before Justice Kelly, Ms. Nigro’s demand of $90,000 was substantially in excess of the cases’s value, viewed objectively, and the Commercial Union offer of $21,000 was less than that value. Commercial Union’s valuation of the case at $35-36,000 was approximately correct.[10]1 infer and therefore find, however, that Ms. Nigro would not have recommended to her clients a settlement of $36,000 had that amount been offered at the April pre-trial conference[11] and the case would not in fact have then settled for that amount.
Both parties left the April pretrial conference without making any movement toward an agreeable middle. At the conclusion of that conference, however, with the trial date looming and the gap between them high, both sides began to undertake serious preparations for trial. On April 26, 1993, Ms. Nigro sent to Mr. Feener a report of Dr. Robert S. Hormell. The report, dated April 16, 1993, obviously was prepared as a foundation for Dr. Hormell’s proposed trial testimony. After reciting Ms. Griffin’s history, Dr. Hormell, an ortho *114 pedic surgeon, stated that Ms. Griffin was suffering from intervertebral disc disease in the C4-5 area that was traumatic in origin, that was moderately severe and that had associated cervical arthritis. He also stated that Ms. Griffin was suffering from headaches that were the result of the disc disease and that she was suffering from a left shoulder sprain that had healed but that had left residual paraesthesiae and muscular weakness. Dr. Hormell opined that Ms. Griffin had a limited ability to do certain kinds of work and that with the passing of time her symptoms of cervical arthritis and disc damage would increase and would require “further study and treatment.” He stated that “[s]he could need hospitalization or surgery [and s]he is vulnerable to aggravation of her cervical and left shoulder conditions, and a relatively minor incident could have a serious effect on her.” Dr. Hormell causally related all of Ms. Griffin’s medical problems to the automobile accident.
Upon receipt of the report, Mr. Feener promptly sent it to Mr. Noonan, who did not change his opinion of the case’s value. Commercial Union did, however, hire its own orthopedic surgeon, Panos Panagakos, M.D. and requested him to review Ms. Griffin’s medical history and prepare, if necessary, for trial testimony.
On May 10,1993, Ms. Nigro sentMr. Feener the report of an economist, Arthur Siegel, who concluded that Ms. Griffin’s lost earning capacity was $402,414, if that lost earning capacity began on January 4, 1991, the date the case was filed, and was $ 194,819 if the loss did not begin until 2003. The latter date was based on Dr. Hormell’s opinion that Ms. Griffin likely would be able to continue with her work unimpaired by her residual injuries “for a decade." The former date was based on a report, by that time not provided to Mr. Feener, prepared by Arthur O’Shea, a vocational consultant. In his report, Mr. O’Shea opined that Ms. Griffin, although actually performing work as a supervisor at the company where she had worked for about 81/2 years and where she had worked without significant interruption since the accident, was not in fact able to do supervisory work and thus would not be able to obtain employment as a supervisor if she were discharged by that company in the future. Instead, Mr. O’Shea opined, Ms. Griffin would be able to secure employment only as a retail clerk.
Ms. Nigro sent Mr. O’Shea’s report to Mr. Feener on May 13. Neither the analytical approach taken by Mr. O’Shea nor by Mr. Siegel nor anything remotely resembling the dollar amounts contained in Mr. Siegel’s opinion had played any role in either side’s analysis of this case, internally or with the other, before May of 1993. None of the approaches discussed in those reports had been disclosed to Mr. Feener before May notwithstanding the two pretrial conferences that had occurred and notwithstanding a conciliation order which had required the parties to present to the conciliator a joint pretrial memorandum conforming to Appendix A to Superior Court Standing Order 1-88. One provision of Appendix A required counsel to list all expert witnesses whom they intended to call at trial along with a synopsis of their anticipated testimony. The names of Dr. Hormell, Mr. O’Shea and Mr. Siegel were not contained in that memorandum.
On May 18, Ms. Nigro sent to Commercial Union a letter of the type described in G.L.c. 93A, §9 in which she contended that Commercial Union had failed to make a reasonable offer of settlement and therefore had violated the provisions of the statute. In that letter, Ms. Nigro stated, among other things, that the offer of $21,000 was an inadequate offer in light of the record regarding Ms. Griffin’s injuries and clearly inadequate when her injuries were considered with Mr. Griffin’s claim for loss of consortium. Ms. Nigro’s letter marked the first time that the loss of consortium claim had been discussed by either side separate and apart from the claim presented by Ms. Griffin. Ms. Nigro’s letter stated that the plaintiffs had incurred increased litigation costs and other damage as a result of Commercial Union’s conduct and stated that “our demand for the policy seems fair and reasonable.” The letter thus contained a demand that was higher than the demand Ms. Nigro had made at the pretrial conference one month earlier.
Mr. Connon responded to Ms. Nigro’s letter with a letter dated May 25, 1993. In essence, Mr. Connon stated that he believed the $21,000 offer Commercial Union had made was fair and reasonable under all of the circumstances.
The case did not proceed to trial in June. Instead, in early June, the parties attended another pre-trial conference, this one before Justice Houston. Again, the possibility of settlement was raised. Ms. Nigro made a demand of $90,000. The parties had some discussion of figures during the course of which Mr. Feener said that, insofar as he was concerned, the worst case scenario was a jury verdict of $35,000.[12] Mr. Feener said that he was prepared to offer $21,000, the amount Commercial Union had had on the table for some time. Justice Houston said, at some point, that he thought that figure was low. At some other point, Ms. Nigro stated that she would be prepared to settle the case for $50,000.
At the end of the conference, Justice Houston gave the parties a September trial date. Mr. Feener promptly reported that date to Mr. Connon and reported to him as well that Ms. Nigro had expressed, albeit in somewhat tentative terms, her willingness to consider a $50,000 offer. Mr. Connon responded that he would stay at $21,000 and was not prepared to have Mr. Feener offer Ms. Nigro anything more.
In August, the case was reviewed internally by Commercial Union again, this time by Mr. Connon’s supervisor, a Mr. Silvestro. As part of the review, Mr. Silvestro talked with Mr. Feener who expressed the view that Ms. Griffin’s case had a value of $25,000 plus interest to which one had to add the value of the consortium claim. Mr. Feener stated that the whole case *115 had a settlement value of approximately $40,000 but that it would take approximately $50,000 to settle it.
After receiving that evaluation from Mr. Feener, Mr. Silvestro talked to Mr. Connon about the possibility of so-called high-low arbitration. As a result of that conversation, Mr. Connon contacted Mr. Feener and instructed him to offer Ms. Nigro a high/low arbitration with low limits of $25,000 and high limits of $45,000. Ms. Nigro responded by stating that she was willing to undertake such arbitration but only if the low limit were $35,000 and the upper limit were $100,000, the limit of Commercial Union’s liability under the policy. Mr. Feener conveyed Ms. Nigro’s response to Mr. Connon who rejected Ms. Nigro’s counterproposal, made no additional counterproposal and instructed Mr. Feener to proceed to trial.
The case proceeded to trial commencing on September 21, 1993. Two days before the trial, a new MRI study performed on the cervical area of Ms. Griffin’s neck revealed a small herniation at C4-5. Dr. Panagakos, Commercial Union’s expert physician, did not believe that that herniation was significant because the study indicated that the herniation was small and that it was not actually impinging on the spinal cord.
Before trial, Mr. Feener made a motion to exclude the reports of Dr. Hormell, Mr. O’Shea and Mr. Siegel on grounds that they were disclosed too late. Those motions were denied. Ultimately, however, Mr. Siegel’s economic analysis was excluded from the trial on grounds that it was too speculative.
The parties entered the trial with a demand of $90,000 and an offer of $21,000 on the table. When plaintiff rested, however, Mr. Feener, after consultation with Mr. Connon, raised Commercial Union’s offer to $35,000. In response, Ms. Nigro reduced her demand to $75,000. The parties were unable to bridge that gap and the case proceeded to the jury. On September 24, the jury returned a verdict of $40,000 which, when interest was added, resulted in a recovery by Ms. Griffin of $53,068.00.
Mr. Griffin did not testify at trial. His claim was withdrawn and was not presented to the jury. He testified at the trial before me that he withdrew his claim because he was frustrated at how long it had taken to get the case to trial, by the cross-examination of Ms. Griffin at trial and by the way the case generally was proceeding. I am not persuaded that he withdrew his claim for that reason.
Overall, I find that, when suit was filed, Ms. Nigro did not have a firm view regarding the value of the case or what she would accept as settlement. She demanded the policy limits essentially in order to see what kind of a value Commercial Union, speaking through Mr. Feener, placed on the case. She believed that the case had a value greater than the $ 15,000 Mr. Feener initially proposed, less that the $90,000 she from time to time demanded but she did not know precisely what that value was. Her initial reduction of her demand to $90,000, her statement that the reduced demand would be available only for a short time, her subsequent reduction of the demand to $65,000, her return first to $90,000, then to $100,000 in the demand letter and then to $90,000 shortly thereafter all reflect that uncertainty and her effort to use those numbers to elicit from Commercial Union a higher offer.
Ms. Nigro’s view of the settlement value of the case, however, crystallized at approximately $50,000 after the conciliation in March of 1993. Her statement at the pretrial conference in June of 1993 that she was prepared to take $50,000 in settlement was genuine and, I infer and therefore find, she would have been prepared to recommend settlement of the entire case for that amount or something slightly less had such an offer been forthcoming. I also infer and therefore find, that had Ms. Nigro recommended $50,000 to them, Mr. and Ms. Griffin would have accepted that amount in settlement.
For its part, the value of approximately $36,000 Commercial Union placed on the case in April of 1992 and maintained in one way or another thereafter was reasonable in light of all of the information available to it before the conciliation in March of 1993. Commercial Union’s offer of $21,000, when measured against that valuation, was low but was intended and designed to induce Ms. Nigro to reduce her demand to an area where Commercial Union thought the case should settle and .to leave Commercial Union some bargaining room in order to meet a reduced demand. Under those circumstances and for that purpose, Commercial Union’s offer was reasonable.
After the conciliation, after Commercial Union received the expert information contained in Ms. Nigro’s April and May offerings and after Mr. Feener’s statement that he believed the case had a settlement value of $40,000, however, I am of the opinion that it no longer was reasonable for Commercial Union to look at the case as one that had a top value of $36,000. I make that finding after discounting entirely the reports of Mr. O’Shea and Mr. Siegel. It would not have been at all unreasonable to set to one side entirely the wildly speculative and manifestly inflated imaginings of those two proposed experts. I also make that finding independent of the jury’s ultimate verdict. The valuation of a case turns on facts and circumstances known to counsel at the time the valuation is made and is not dependent on subsequent events.
By the time Mr. Feener made his assessment, however, Commercial Union knew that the special damages were slightly over $10,000, knew from its own expert’s report that there had been a five week permanent disability, knew from its own expert’s report that there had been a 52 week partial disability, knew that it had no reasonable chance of successfully resisting plaintiffs claim that the accident resulted from Mr. Coombs’s negligence, knew that it could show no comparative negligence on Ms. Griffin’s part, knew that it *116 had no grounds for claiming that Ms. Griffin was malingering, knew that there was a consortium claim of some value and knew that any judgment would carry with it interest totaling 27%. A $36,000 “top” value for the case thus represented a $28,000 jury verdict. In addition, Commercial Union knew that its own trial counsel, who had had a chance to see and assess all of the principal witnesses stated that the case had a settlement value of $40,000, an assessment that necessarily recognized a somewhat higher “top” value.
Commercial Union’s August offer of a high-low arbitration was not, in principle, unreasonable. Given the case’s settlement value at the time Commercial Union made that offer, however, both the high limit and the low limit were unrealistically low, although not unreasonably so for a first proposal. Ms. Nigro’s response was, like the position she had earlier taken in the case, unrealistically high. Nevertheless, Mr. Connon’s election to break off negotiations, offer no more money and instruct Mr. Feener to proceed to trial in response to Ms. Nigro’s response was unreasonable considered both in isolation and in the context of Ms. Nigro’s stated willingness to accept $50,000 in full settlement of the case.
Commercial Union unreasonably failed to make a settlement offer in the vicinity of $35-40,000between the time of the June pretrial conference and the time trial began. By the time of the pretrial conference, eveiyone who looked at this case carefully was of the opinion that the full value of the case, without interest and without discount for liability, was at least $35,000. No realistic liability discounts were applicable for, apart from the lightning that occasionally strikes, there was no hope of a defendant’s verdict. Three outside observers — a conciliator and two judges — had told Commercial Union that its offer was low. And, after Ms. Nigro reduced her demand to $50,000, Commercial Union no longer had a strategic justification for using its low offer of $21,000 as bait designed to induce Ms. Nigro to drop her unrealistically high demand.[13] Under these circumstances, failing to make an offer of between $35,000 and $40,000 after the June pretrial conference and before the trial began.
Having said that, I am not persuaded on this record that an offer of $35-40,000 would have produced a settlement. On this record, I cannot find that, more probably than not, Ms. Nigro would have recommended a settlement figure in the $35-40,000 range to her clients or that they would have accepted any such figure without her recommendation.[14]
Finally, I infer and therefore find, that Commercial Union knew before the trial began that its offer of $21,000 was unreasonably low. Mr. Connon, after all, had given Mr. Feener “authority” for $25,000 long before the trial began although he thereafter had not permitted Mr. Feener to use all of that “authority.” Commercial Union in fact offered $35,000 during the trial. At the time it made the offer, however, Commercial Union had encountered no unexpectedly unfavorable developments. On the contrary, it had succeeded in eliminating from the trial the large dollar amounts contained in Mr. Siegel’s analysis and Mr. Griffin had abandoned the consortium claim. Under those circumstances, it is clear that Commercial Union knew that a reasonable settlement offer was in the vicinity of $35,000 before the trial began and elected not to make it nonetheless.
Conclusions of Law
Before turning to the more difficult issues this case presents, it is worthwhile to clear away two pieces of underbrush. Count II of plaintiffs complaint seeks recovery on grounds that defendant violated G.L.c. 176D, §3(9)(b) by failing to “acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.” Assuming that a violation of that provision of the statute can be shown by proof of events occurring in a single case, see, e.g., Van Dyke v. St Paul Fire & Marine Insurance Co., 388 Mass. 671, 675-76 (1983); Trempe v. Aetna Casualty and Surety Co., 20 Mass.App.Ct. 448, 456-57 (1985), there was no failure here of prompt responses or prompt actions. Instead, once the litigation was filed in March of 1991, it proceeded with reasonable dispatch in relation to the environment in which it was progressing.[15]
Secondly, counsel for plaintiff, in his summation suggested that it was a violation of Chapter 176D, §3(9) (f) for an insurer to fail to make a reasonable offer of settlement after liability has become reasonably clear regardless of whether or not the demand was reasonable. In my view, that simply is not an appropriate way to read the statute. The word “reasonable” is a relational term. The litigation process is a process by which two sides with opposing views move voluntarily or involuntarily toward a resolution of whatever controversy divides them. Historically, and perhaps inevitably, that voluntary movement is the result of bargaining usually undertaken by each side with an eye on the place where he or she wants to be in the end. While Chapter 176D was designed to forestall foot-dragging and oppressive escalation of costs, they were not designed to eliminate the bargaining that has been at the heart of the litigation process since that process began. See generally Clegg v. Butler, 424 Mass. 413, 420 (1997), quoting Calimlim v. Foreign Car Center, Inc., 392 Mass. 228, 234 (1984) (“Our standard for examining the adequacy of an insurer’s response to a demand for relief under G.L.c. 93A, §9(3), is whether, in the circumstances, and in light of the complainant’s demands, the offer is reasonable”); Curtis v. Duffy, 742 F.Sup. 34, 38 (D.Mass. 1990) (Skinner, J.). In view of Ms. Nigro’s demand and of the information Commercial Union had at its disposal through discovery and its independent evaluations, I am of the opinion that its offer of $15,000 and then $21,000 against a reasonable full value for the case of *117 $35-36,000 was not unreasonable before Ms. Nigro reduced her demand at the June pretrial conference.
That leads to the difficult question this case presents. In Count I, plaintiff alleges that Commercial Union failed to fulfill its obligations under Chapter 176D, §3(9)(f) by “failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.” The question thus is whether Commercial Union violated those statutes by failing to change its offer of $21,000 between the time of the June pretrial conference and the time trial began.[16]
The answer to that question is yes. As I have found, by the time trial began, Commercial Union knew that liability could not reasonably be contested, that the plaintiffs special damages were in excess of $10,000, that the plaintiffs physician was going to testify as to a significant, ongoing injury that was causally related to the accident, that its own physician had concluded that there had been a significant ongoing injury causally related to the accident, that there was a consortium claim, that approximately 27% interest would be added to any jury verdict, that the conciliator had placed avalué of $50,000 on the case, the two judges had suggested during the course of settlement conferences that Commercial Union’s offer of $21,000 was low, that the adjuster it had assigned to the case had expressed her opinion more than 18 months earlier that the full value of the case, without interest or discount for liability, was $35-36,000, that nothing in the interim had been discovered to lessen that value, that plaintiffs counsel, at the June conference had indicated a willingness to accept $50,000 in settlement and, thereafter, Commercial Union’s own attorney had given the case a settlement value of $40,000 and had stated his belief that it could settle for between $40,000 and $50,000. Under those circumstances, to allow the case to proceed to trial with an offer of $21,000 on the table was not a reasonable effort to effectuate a settlement and no reasonable insurer would have done so. Cf. Hartford Cas. Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 121 (1994). No one of the cited factors, viewed in isolation, produces that conclusion. Together, however, they show a clear statutory violation.[17]
As I stated earlier, an insurer is not required to proceed in splendid isolation without regard or reference to the context in which negotiations are occurring. It was not, therefore, unreasonable for Commercial Union to offer $21,000 when Ms. Nigro’s demand stood at $90,000. After she indicated at the June pretrial conference a willingness to accept $50,000, however, Commercial Union was obliged to come forward with an offer far greater than $21,000— a sum, after all that represented only 60% of its own valuation of the case and which was $4,000 less than the authority it had given to Mr. Feener months earlier — or to take some other affirmative steps designed effectuate a prompt, fair and equitable settlement.[18]
To be sure, Commercial Union’s offer of high-low arbitration was, in principle, the kind of affirmative step that could fulfill Commercial Union’s obligation. Such a device often is extremely useful for resolving cases in which liability is reasonably clear but the parties are truly divided about damages. Commercial Union’s proposed limits were, as I have found, low. In and of itself, proposing those low limits was not an unreasonable opening effort to produce an agreement, although given the length of time the matter had by then been pending and the proximity of trial, proposing those limits at that time was right at the margin. Nevertheless, when Ms. Nigro rejected Commercial Union’s proposal, it was incumbent on Commercial Union either to make a higher offer of settlement or to increase to a reasonable level the “high-low" limits it was proposing. It did neither.
Not only did Commercial Union’s conduct violate the statutes, but it did so knowingly and willfully as those terms are used in c. 93A, §9(3). See Whelthan v. Markowski, 37 Mass.App.Ct. 209, 213 & n.7 (1994); Montanez v. Bagg, 24 Mass.App.Ct. 954, 956 (1987) (rescript); Grossman v. Waltham Chemical Co., 14 Mass.App.Ct. 932, 934 (1982) (rescript). There was absolutely no testimony or evidence upon which to conclude that a fair and reasonable value for this case was $21,000 after the June pretrial conference. The conciliator did not think so, the two judges who expressed their views at pretrial conferences did not think so, defendant’s own counsel did not think so, Commercial Union’s Ms. Mollon did not think so and Mr. Connon himself had authorized payment of $4,000 more but never permitted Mr. Feener to offer the full amount he himself had authorized him to offer. In August of 1993, $21,000 represented a verdict of $16,530, in a case where there was no doubt as to liability, no doubt about special damages, no realistic doubt about at least a one-year partial disability, a consortium claim and a nonfrivolous claim of some, perhaps minor, permanent residual impairment. No reasoning person acting in good faith could have fairly concluded that $21,000 was an appropriate settlement value for this case just before trial began.[19] In fact, as I have found, Commercial Union knew it was not.
Plaintiffs urge that defendant’s violation of c. 176D entitles them to recover under c. 93A, §9(3) all of their costs after Ms. Nigro sent her demand letter in May of 1993. Actual damages recoverable under c. 93A, §9, however, are those causally related to the proved violation. Kapp v. Arbella Mut. Ins. Co., 426 Mass. 683, 685-86 (1998), quoting Yeagle v. Aetna Casualty & Surety Co., 42 Mass.App.Ct. 650, 653-54 (1997). On this record, I am unable to say that defendant’s statutory violation caused plaintiffs to incur costs after May of 1993 because I am unable to conclude that a settlement offer in the vicinity of $36,000 made thereafter would, more likely than not, have produced a settlement. Ms. Nigro did not testify at trial that she ever was prepared to recommend to her clients that they accept anything less than *118 $50,000. Indeed, her $50,000 demand at the June pretrial conference, while firm enough to require Commercial Union to increase its offer to something closer to its own valuation of the case, was not ironclad and, viewed against the backdrop of its predecessors, did not cany with it any guarantees that it would be withdrawn in favor of a higher sum. In fact, Ms. Nigro’s next demand, after she finished presenting at trial a case not materially different from the case she anticipated in June, was $75,000.
Nevertheless, plaintiffs each are entitled to recover $25.00 under the provisions of G.L.c. 93A, §9. That statute provides, in pertinent part, as follows:
(1) Any person, other than a person entitled to bring action under Section eleven of this chapter, who has been injured by another person’s use or employment of any method, act or practice declared to be unlawful by Section two or any rule or regulation issued thereunder or any person whose rights are affected by another person violating the provisions of clause (9) of Section three of chapter one hundred and seventy-six D may bring an action in the superior court, or in the housing court as provided in Section three of chapter one hundred and eighty-five C whether by way of original complaint, counterclaim, cross-claim or third-party action, for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.
(3) . . . [I]f the court finds for the [plaintiff] recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater . . .
Emphasis added.
Section 9(1) thus contains two circumstances, injury or adverse impact on rights, under which damages are recoverable. The two are not the same. Statutory language, of course, should be given its plain and usual meaning. New England Medical Center Hosp., Inc. v. Commissioner of Revenue, 381 Mass. 748, 750 (1980). Accordingly, “where the Legislature has employed specific language in one [clause] but not in another, the language should not be implied where it is not present." Commonwealth v. Galvin, 388 Mass. 326, 330 (1983). In other words, “where the Legislature chose two completely different phrases in . . . two [separate] clauses, it must have intended different meanings.” Commonwealth v. Caracciola, 409 Mass. 648, 654 n.8 (1991). Construing the language of C. 93A, §9(1) in that light, it is apparent that either an “injury” or an adverse impact on rights that does not amount to a traditional injury will permit recovery when an alleged violation of c. 176D, 3(9) is involved.[20]
Assuming that Commercial Union’s conduct did not produce a traditional “injury," that conduct nevertheless had an adverse impact on plaintiffs’ rights. The statutory duly imposed on Commercial Union to make a reasonable offer endowed plaintiffs with a correlative right to receive one. See Hohfeld, Some Fundamental Legal Conceptions as Applied to Legal Reasoning, 23 Yale L.J. 16, 49-51 (1913-14). See generally, McDuffy v. Secretary of Executive Office of Educ., 415 Mass. 545, 566 n.23 (1993). They never did. Manifestly, their right to receive a reasonable offer thus was adversely affected by Commercial Union’s failure to deliver it. That adverse effect entitles them, without a showing of causal harm, to statutory damages of $25.00.
My finding and conclusion that Commercial Union’s violation of the statute was knowing and wilful leads me to a further conclusion that double damages are appropriate. Although it violated the statute and did so knowingly and wilfully, Commercial Union’s behavior was not at the far edges of the kind of conduct Chapter 93A is designed to prohibit. Double damages are, in my view, thus sufficient.
That conclusion leads one to the final question. What amount is to be doubled: $25.00 or the $53,068.00 Ms. Griffin recovered at trial? The statutory language supplies the answer. Chapter 93A, §9(3) provides, again in pertinent part, that
[I]f the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a wilful or knowing violation of said Section two or that the refusal to grant relief upon demand was made in bad faith or with knowledge or reason to know that the act or practice complained of violated said Section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and undedying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim
(Emphasis added.)
In light of that language, Mr. Griffin, who never received a judgment in any other proceeding arising out of the facts and allegations at the heart of the present claim, is entitled to a doubling of the $25.00 awarded here. Clegg v. Butler, 424 Mass. 413, 425 (1997). Ms. Griffin’s case, however, received a judgment of $53,068.00. She therefore is entitled to a judgment doubling the $53,068.00 she recovered in the underlying trial.
The conclusion last stated may, upon initial examination, appear highly anomalous. After all, the statutory violation produced no provable damages and the $25.00 statutory damages awarded are tiny in comparison to a punitive award of over $53,000.00. Two considerations, one structural and one substantive, nonetheless make the award appropriate.
Structurally, the conclusion I have here drawn is required not only by the literal language of the governing statute — surely the most reliable guide to Legislative desire and purpose — but is also consistent with the Legislature’s desire to provide a real and substan *119 tial incentive for statutory compliance. To that end, the statutory language
threaten[s] a bad faith defendant with multiplication of the amount of the judgment secured by the plaintiff on his basic claim — a total that might be many times over the interest factor [that typically is the measure of actual damages under c. 93A], [a total that is] arbitrary in the sense that it exceeded the injury caused by the c. 93A violation, and [and a total that] work[s] an in terrorem addition to what [is] already a punitive sanction.
Yeagle v. Aetna Cas. & Sur. Co., supra, 42 Mass.App.Ct. at 655.
Substantively, but related, an award of damages in an amount the statute requires is likely to place an appropriate brake on the otherwise unregulated give and take of the settlement process. No reasoning observer can fail to conclude that a significant part of the cost, to litigants and to society, of resolving the myriad damage claims annually brought to the courts stems from parties’ efforts to deal with inappropriate offers or demands. That is not to say that most cases produce offers or demands wholly out of proportion to the provable facts. On the contrary, most do not and most, as a consequence, are resolved well short of trial. It is to say, however, that the cases which produce unreasonable offers and demands impose on litigants and on the society costs that are wholly avoidable and that divert resources better aimed at resolution of cases where reasoned, good-faith differences prevent resolution through voluntary accord. A statutory scheme that provides strong incentives for making reasonable offers and demands cannot guarantee settlement of all cases that can and should be settled. My findings in this very case demonstrate that. By providing a significant stimulus for production of reasonable offers, however, such a scheme goes a long way toward insuring that the bargaining process, at some stage, contains the ingredients on which a fair and reasonable settlement can be reached and without which such settlements are impossible. Society therefore has an interest in seeing to it that reasonable offers are made even in those circumstances when it cannot be said that such offers would in fact have produced an accord.
Applying c. 176D and c. 93A in the manner in which they have been applied here produces the following result: As long as the plaintiff takes an unreasonable position, the defending insurer is permitted broad latitude to maneuver with impunity in an effort to produce a reasonable demand. A plaintiff who takes an unreasonable position thus expends unnecessary and uncompensated time and effort to achieve results that a reasonable demand might have produced with far greater dispatch.[21] When the plaintiff enters the zone of reason, however, the insurer has an obligation to make an offer that fairly and reasonably reflects what the case is really worth. An insurer that fails to make a reasonable offer under those circumstances risks incurring substantial penalties.[22]
ORDER
In light of the foregoing, it is hereby ORDERED that judgment enter
1. In favor of plaintiff, Thomas Griffin, in the amount of $25.00 with interest on Count I of the complaint and $25.00 without interest on Count III of the Complaint.[23]
2. In favor of plaintiff, Patricia Griffin, in the amount of $25.00 with interest on Count I of the Complaint and $53,068.00 without interest on Count III of the Complaint.
3. In favor of defendant, Commercial Union Insurance Company, dismissing Count III of the Complaint.
It is further ORDERED that if plaintiffs desire an award of attorneys fees, they shall submit, pursuant to Superior Court Rule 9A, a motion for such fees. Upon consideration thereof, the court shall hold a hearing or make an award without further hearing.

The record does not reflect the citation’s ultimate disposition.

he IME report Commercial Union received in November of 1991 stated that the period of total disability was five weeks. In her March claim analysis, however, Ms. Mollon used a total disability period of 4 weeks. It is not clear why she did so. The consequences of that choice, however, do not affect the issues in this case in any material way.

In fact, Ms. Griffin continued to receive medical treatment sporadically after 52 weeks. Nevertheless, Commercial Union’s conclusion that her partial disability ended 52 weeks after the accident, while neither generous nor compelled by the facts in Commercial Union’s possession, was not unreasonable.

It is difficult to see how realistic bargaining can occur unless both sides share at least some common basic assumptions. The settlement value of a case pending in a judicial system has a great deal to do with the anticipated jury verdict because the entire settlement process is designed to anticipate what a jury will do and then achieve a resolution that accounts for the risks inherent in finding out for certain. To jettison consideration of anticipated jury verdicts thus is to put negotiations at sea without a compass.

 Despite their separate uses, the two documents have essentially the same overall objective: placing a value on the case from Commercial Union’s standpoint.

 In the sense I am using that term, “exposure” refers to the highest verdict that could be returned without the likelihood of a remittitur or a new trial.

Commercial Union routinely set up a separate reserve for attorneys’ fees and costs.

Apparently, surveillance was routinely conducted in cases of this type where claims of extended pain and suffering had been made.

 following the conciliation, Mr. Connon wrote a note to his file in which he stated that the conciliator was a lawyer who tried only plaintiffs personal-injury cases and, in addition to placing a value on the case, had “inferred” that Ms. Nigro should send Commercial Union a letter under G.L.c. 93A if Commercial Union did not increase its offer. “Conciliation is great!” said Mr. Connon in closing his note. In fact, the conciliator was a skilled and able lawyer who practiced in the Lowell area and whose valuation of the case turned out *120 to be entirely accurate. In and of itself, however, Mr. Connon’s refusal to place substantial weight on that valuation is neither surprising nor an indication of unfairness. The utility of any third-party’s valuation of any case depends on the extent to which both sides regard the evaluator as a credible and neutral source for valuation judgments. Accordingly, it is not so much the soundness in fact of the evaluator’s judgment that counts as it is whether the parties believe that the judgment is sound. Many different factors, including perceptions of the evaluator’s biases, conscious or unconscious, necessarily play a role in that judgment.

In this area, of course, one necessarily deals in approximations for there is no, single “correct" value for any case before a verdict establishes what that value is.

At the trial of this case, Ms. Griffin did not testify and thus there is no evidence from which to conclude, on the basis of first-hand testimony, what Ms. Griffin would have done or not done had a $36,000 offer been placed before her. From the absence of any such testimony, however, I infer that she would have followed Ms. Nigro’s recommendations and thus that a $36,000 offer, had it been made, would not have been accepted.

The $35,000 figure was based on the analysis that had been in Commercial Union’s files since Ms. Mollon created it in April of the previous year. By June of 1993, of course, a $35,000 verdict would have carried with it approximately 27 months interest which, at 12%, would have amounted to $9,450. Mr. Feener’s worst case scenario therefore amounted to a loss of approximately $44,400.

In that regard, I reject plaintiffs’ suggestion that Commercial Union was required to deal with the consortium claim separately. To be sure, that claim had to be considered in arriving at a fair settlement value for the entire case. But there is no suggestion anywhere in this record that either the consortium claim or the primary claim could have been settled separately. Nor is there any evidence that the two are customarily divided for the purpose of settlement discussions.

That is not a finding that a settlement would not have occurred had such an offer been made. It is simply a finding that I am unable to determine what would have happened.

The Lowell session of the Middlesex Superior Court was at the time engaged in various projects designed to resolve large numbers of cases as promptly as possible notwithstanding insufficient resources with which to do so.

One cannot, of course, “effectuate” a settlement by oneself. The statute therefore would impose an impossible, or at least grossly unfair, burden on an insurer unless it were read, as I read it, to require no more, but no less, than an insurer’s use of reasonable efforts to “effectuate” a settlement. See, e.g., Van Dyke v. St Paul Fire and Marine Ins. Co., 388 Mass. 671, 676 (1983) ("The question under [c. 176D, §91](f) is whether St. Paul failed to make a prompt, fair, and equitable settlement offer when liability became reasonably clear”). Statutes, of course, should be interpreted in a reasonable manner designed to accomplish the legislative goals manifest in the statutory language. E.g., Belanger & Sons v. Joseph M. Concannon Corp., 333 Mass. 22, 25 (1955).

There are suggestions in decided cases that a violation of §3(9) (f) requires a pattern of conduct in different cases and not simply a single incident. See, e.g., Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass. 671, 676 (1983); Trempe v. Aetna Cas. and Sun Co., 20 Mass.App.Ct. 448, 456 (1985). But see, e.g., Noyes v. Quincy Mut. Fire Ins. Co., 7 Mass.App.Ct. 723, 726 (1979). Most recently, however, the Supreme Judicial Court in Clegg v. Butler, 424 Mass. 413 (1997), and the Appeals Court in Yeagle v. Aetna Cas. & Sur. Co., 42 Mass.App.Ct. 650 (1997), discussed at some length the standards for determining liability under §3(9) (f) without mentioning any issues regarding whether the statute applied to a single violation and not simply a pattern. See also Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass.App.Ct. 955, 956 n.3 (1995) (rescript). While it usually is unwise to assume that an appellate opinion was intended to dispose of an undiscussed subject, the extended discussions those opinions contained would appear to be almost entirely pointless if a pattern had to be found before the principles contained in the discussions even applied. Moreover, the Court in Clegg clearly interpreted §3(9)(f) in a manner designed to advance its settlement-inducing role. Interpreting the statute as applying to single instances of conduct does just that. I therefore interpret the statute as applying to single instances.

Ms. Nigro sent Commercial Union her 93A demand letter well before the June pretrial conference. At the time she sent it, Commercial Union had not committed an unfair or deceptive practice. Chapter 93A, §9(3) provides in pertinent part that: “At least thirty days prior to the filing of any . . . action [pursuant to §9(1)], [the claimant shall send the prospective defendant] a written demand for relief, identifying the claimant and reasonably describing the unfair and deceptive act or practice relied upon and the injury suffered.” Ms. Nigro’s letter, however, identified the unfair and deceptive practice as Commercial Union’s failure to make a reasonable offer of settlement. In the context of ongoing negotiations, it would be unreasonable to construe the statute as requiring a new demand letter each time a claimant felt that the prospective defendant had not made a reasonable offer. Indeed, that construction of the statute could require new demand letters every day. As long as the alleged unfairness arises out of the negotiations that prompted the demand and as long as the alleged unfairness is of the same character as that specified in the demand, I am of the opinion that a letter of the type §9(3) requires has a continuing vitality for the litigation’s life. Commercial Union nevertheless maintains that Ms. Nigro’s letter did not contain a specific demand for relief and thus did not comply with the statutory requirements. The letter, however, stated that Ms. Nigro believed her demand for the policy was reasonable. No great interpretive efforts were required to determine that her letter was a demand for the policy or something close to it. Her letter complied with the statute.

In finding a knowing and wilful violation of the statute, I apply a subjective standard. See generally Underwood v. Risman, 414 Mass. 96, 100 (1993).

It may also be that, although there is a difference between the two, that difference is really very small. As the Supreme Judicial Court put it recently in Clegg v. Butler, 424 Mass. 413, 418 (1997):
[The] broad language of §9(1) entitles any plaintiff to recover under c. 93A, §9, if his rights are adversely affected or if he suffers “injury” because of another party’s breach of his statutory duty. Id. In this context, “injury" simply refers to “the invasion of any legally protected interest of another.” Leardi v. Brown, 394 Mass. 151, 159, quoting Restatement (Second) of Torts §7 (1965).
(Emphasis added.) See also Transamerica Ins. Group v. Turner Constr. Co., 33 Mass.App.Ct. 446, 452 (1992).

Given the prevalence of contingent fees in this area, the plaintiffs attorney is likely to bear at least a substantial share of the unrecoverable costs of unreason. That result is neither avoidable nor undesirable for it helps to sharpen the focus of all concerned with the plaintiffs claim.

One might argue that the risk of incurring interest at the rate of 12% on an adverse judgment is already a substantial incentive toward reasonable behavior. In an era where overall annual returns on investments are substantially in excess of 12%, however, the incentive produced by 12% interest diminishes, if, indeed, it does not disappear.

Punitive damages awarded under c. 93A do not bear prejudgment interest. McEvoy Travel Bureau, Inc. v. Norton Company, 408 Mass. 704, 716-18 (1990).